

# In the
# Missouri Court of Appeals
# Western District

| | |
|---|---|
| IN RE: JESSIE MCKIM | ) |
| | ) WD77803 |
| Petitioner, | ) |
| | ) OPINION FILED: January 20, 2015 |
| v. | ) |
| | ) |
| JAY CASSADY, WARDEN, JCCC, | ) |
| | ) |
| Respondent. | ) |

## ORIGINAL PROCEEDING IN HABEAS CORPUS

Before Writ Division: Mark D. Pfeiffer, Presiding Judge, Cynthia L. Martin, Judge and Gary D. Witt, Judge

Jessie McKim ("McKim") was convicted in 1999 in the Circuit Court of Adair County of first degree murder in the death of Wendy Wagnon ("Wagnon"). The State charged and convicted McKim on the theory that McKim acted in concert with James Peavler ("Peavler")[1] to cause Wagnon's death by suffocation. At trial, the Boone County Medical Examiner, Dr. Jay Dix ("Dr. Dix"), testified that Wagnon's cause of death was "asphyxiation or suffocation."

---

[1] Peavler was McKim's uncle.

McKim has filed a petition for writ of habeas corpus ("Petition") requesting the vacation of his conviction and a new trial because newly discovered evidence clearly and convincingly establishes that he is actually innocent (a freestanding actual innocence claim). In the alternative, McKim asks this court to grant him a new trial because the preponderance of the evidence establishes either the gateway of cause and prejudice, or the gateway of manifest injustice in light of new evidence of actual innocence, either of which permits review of procedurally defaulted claims that he was deprived of a fair trial. Finally, McKim requests that his conviction be vacated because his continued servitude violates the Thirteenth Amendment[2] as he has been imprisoned for more than 17 years for a murder he claims never happened.

The foundation for McKim's habeas claims is the testimony of several pathologists who now opine that Wagnon's autopsy results suggest that Wagnon's cause of death was methamphetamine overdose, and not asphyxiation or suffocation as opined by Dr. Dix. According to McKim, these new opinions call into question whether the State established a *corpus delicti*.[3]

We conclude that McKim has not established a basis for habeas corpus relief. Accordingly, McKim's Petition is denied with prejudice.

---

[2]U.S. Const. amend. XIII, sec. 1. The Thirteenth Amendment forbids "involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted. . . ."

[3]"The term 'corpus delicti' is Latin for 'body of the crime.'" *State v. Madorie*, 156 S.W.3d 351, 354 (Mo. banc 2005). "The term is used in the context of criminal law to describe the prosecutor's burden of proving that a crime was committed by *someone,* independent from a defendant's extrajudicial statements." *Id*. at 354-55 (emphasis in original).

# I.

## Factual and Procedural History

Wagnon's body was found in a ditch by the side of a dirt road in Adair County on April 13, 1997. An investigation into Wagnon's death led to the arrests of McKim and Peavler. McKim was charged with acting in concert with Peavler to cause Wagnon's death by suffocation. McKim was tried in April 1999, and convicted of first degree murder.[4]

The evidence, viewed in the light most favorable to the judgment,[5] established that Wagnon and her friend Melissa McFarland ("McFarland") went to Peavler's home in the early morning hours of April 13, 1997 at McFarland's urging. McFarland testified that McKim was also at Peavler's house, and that they all smoked methamphetamine. McFarland testified that Peavler argued with Wagnon, and accused her of stealing. Peavler told McKim to shoot Wagnon if she tried to leave. Then, according to McFarland, McKim went outside and came back with a syringe that he began filling with a red fluid, saying "we're not going to remember nothing after this point." McFarland claimed that Peavler and McKim talked about the fact that Wagnon was going to die of a drug overdose. Wagnon reportedly said that she didn't "shoot up," to which Peavler and McKim responded that there was a first time for everything. McFarland suggested that Wagnon be allowed to leave, but was told Wagnon would "not see the dawn." McKim then went outside to move McFarland's vehicle. Peavler started dragging Wagnon out of

---

[4]McKim was also charged with felonious restraint and armed criminal action. The jury acquitted McKim of these charges.

[5]*State v. Sutton*, 427 S.W.3d 359, 359 n.1 (Mo. App. W.D. 2014) ("We view the evidence in the light most favorable to the conviction.")

the house in a headlock. The two men then forced Wagnon into a pickup truck with McKim sitting in the driver's side pulling on Wagnon. McFarland testified that Peavler returned to the house and said "it's up to [McKim] now." McKim came back into the house and asked for a blanket, before leaving in the truck with Wagnon. Peavler told McFarland that McKim "had no other choice." Later, McKim returned, and he, McFarland, and Peavler collected some of Wagnon's belongings and hid them downstairs. They concocted a story that Wagnon was last seen leaving Peavler's house at about 4:00 a.m. in a red car with someone they did not know.

Peavler's daughter, Kandi Peavler, ("Kandi"),[6] testified that when she arrived home in the early morning hours of April 13, 1997, Peavler, McKim, McFarland, and Wagnon were present. Kandi went to her room to go to bed, but later heard an argument, heard the word "bitch," and had the impression that Wagnon was in trouble.

Wagnon's mother testified that Wagnon and McFarland had argued the night of the murder because Wagnon was preparing to testify in a drug prosecution involving McFarland's boyfriend. Wagnon's mother testified that McFarland showed up in the early morning hours of April 13, 1997 and persuaded Wagnon to go to Peavler's house.

Pam Western ("Western"), a friend of McFarland's, testified that McKim told her about four days before Wagnon's death that if he found out that Wagnon was a snitch he would kill her.

Linda Yearns ("Yearns"), McKim's former girlfriend, testified that McKim came to her house the night that Wagnon's body was found, and asked if he could stay there.

_____

[6]We use Kandi's first name to avoid confusion. No disrespect is intended.

4

Yearns told McKim she had heard that Wagnon had been beaten to death, to which McKim responded that he had heard Wagnon was strangled. The next day, Yearns learned that McKim was wanted for questioning in Wagnon's murder. She confronted McKim, who asked her to give him a ride "up North," which she refused to do.

Dana Scott Cooper ("Cooper") testified that he and McKim were in jail together for several months. McKim told Cooper that it was common knowledge that Wagnon was a snitch, and that a good snitch was a dead snitch. McKim told Cooper that he, Wagnon, McFarland, and Peavler, were all at Peavler's house, when a confrontation with Wagnon led to McKim and Peavler dragging Wagnon out of the house and into a vehicle. McKim told Cooper that Wagnon died in McKim's grip while he held her in a headlock. Cooper testified that McKim told him that he dumped Wagnon's body on a back road.

Adair County Coroner Brian Noe ("Noe") testified that he completed a death certificate based on an autopsy performed by Dr. Dix. The cause of death on the death certificate was noted to be "asphyxiation by undetermined method."

Dr. Dix testified that he performed the autopsy on Wagnon. During the autopsy, Dr. Dix observed petechiae, or "ruptured blood vessels," in the eyes. He opined that Wagnon died "as a result of asphyxiation or suffocation."[7]

McKim claimed he had an alibi, and that he was never at Peavler's house on the day Wagnon died. McKim's cross-examination of witnesses sought to expose motivations for fabricating or distorting testimony. McKim's counsel argued that Peavler and McFarland were solely responsible for Wagnon's death, and that McFarland

---

[7]Other details regarding Dr. Dix's testimony are discussed later in this Opinion.

5

fabricated the story about McKim's involvement to deflect attention from her own culpability.

The jury was instructed that to convict McKim of first degree murder, it had to find beyond a reasonable doubt that McKim or Peavler[8] caused the death of Wagnon "by suffocating her." The jury convicted McKim of first degree murder. We affirmed McKim's conviction on direct appeal. *State v. McKim*, 39 S.W.3d 930 (Mo. App. W.D. 2000). McKim filed a Rule 29.15 post-conviction motion that was denied. We affirmed the denial of that motion. *McKim v. State*, 116 S.W.3d 599 (Mo. App. W.D. 2003). McKim did not question Dr. Dix's cause of death determination on direct appeal or in his post-conviction motion.

In 2010, McKim heard from Peavler,[9] who sent McKim statements he had obtained from three pathologists who had reviewed Wagnon's autopsy report, toxicology report, and Dr. Dix's trial testimony. The pathologists had concluded that Dr. Dix improperly opined that Wagnon died from asphyxiation based solely on petechiae in the eyes, as petechiae are a non-specific condition that can occur in connection with many causes of death. The pathologists each concluded that Wagnon's toxicology report suggested that she died of a methamphetamine overdose, though the manner of overdose, i.e. whether by accident, suicide, or homicide, could not be determined.

On October 18, 2010, McKim filed a *pro se* petition for writ of habeas corpus in the Cole County Circuit Court. The *pro se* petition raised two claims: 1) a freestanding

---

[8]Peavler was tried separately less than two weeks after McKim. Peavler was also convicted of first degree murder.

[9]Peavler died in prison on September 1, 2010.

6

actual innocence claim based on the fact that Wagnon died of methamphetamine toxicity and not asphyxiation; and 2) a claim that Dr. Dix committed perjury by testifying that Wagnon died from asphyxiation. McKim theorized that there was no murder if Wagnon died of a drug overdose. McKim submitted the affidavits and letters from the pathologists who had been in communication with Peavler. On April 20, 2011, the Honorable Jon Beetem denied McKim's *pro se* habeas petition without an evidentiary hearing. Judge Beetem found as to McKim's freestanding claim of innocence that:

> McKim's new evidence consists of opinions, by experts, who have not worked on the case or examined the body themselves, that a more likely cause of death was drug overdose as opposed to asphyxiation. This new evidence does not address the overwhelming evidence that McKim said he was going to kill [Wagnon], killed her and then said he killed her and attempted to both create a cover story and to escape the area, when he knew he was a suspect. Assuming for the sake of argument that Dr. Dix is wrong and the defense experts are right about the cause of death their evidence strongly supports McKim's guilt, not his innocence.

> [McFarland] testified that she saw the victim[10] draw up a syringe and heard McKim and his accomplice Peavler state their intention of giving [Wagnon] a lethal overdose of drugs before dragging her outside to her death. Assuming that [Wagnon] died from allegedly metabolizing a lethal amount of methamphetamine, that assumption concerning the cause of death supports McKim's guilt. . . .

> McKim has not come close to setting out a case of actual innocence . . . by showing his factual innocence by clear and convincing evidence, and his claim fails. McKim is no less guilty of murder if [he] killed [Wagnon] through a lethal injection.

On McKim's claim that Dr. Dix perjured himself, Judge Beetem found:

---

[10]Though Judge Beetem's judgment references "the victim," we assume he meant to reference McKim, based on McFarland's testimony at trial.

7

First, the testimony of Dr. Dix was not false. It was his opinion based on physical findings that were known to both sides and were subject to cross-examination, and to contrary testimony from defense experts, should McKim have chosen to present them at the time, which he did not.

Second, . . . [i]f McKim had put on evidence at trial that the victim had died from a lethal overdose, after testimony that he had drawn up a syringe and professed his intention to give the victim a lethal overdose, before dragging her away to her death, there is no reasonable probability [] that the jury would have acquitted. The claim that McKim was convicted because of allegedly perjured testimony by Dr. Dix is refuted by the record.

Following the entry of Judge Beetem's judgment, McKim filed a nearly identical *pro se* petition for writ of habeas corpus in this court on May 26, 2011. We denied the petition by order dated June 29, 2011. McKim then filed the same *pro se* petition for writ of habeas corpus in the Missouri Supreme Court on September 19, 2011. The Supreme Court denied the petition by order dated October 25, 2011.

On December 16, 2011, McKim filed another *pro se* petition for writ of habeas corpus in the Circuit Court of Adair County. The Honorable Russell Steele ordered the petition transferred to the Circuit Court of Cole County.[11] The Honorable Daniel R. Green appointed the Missouri State Public Defender as counsel for McKim. When the Missouri State Public Defender refused the appointment, Jennifer Bukowsky agreed to represent McKim on a *pro bono* basis. She thereafter filed an amended habeas petition on McKim's behalf, alleging the same claims for habeas relief that are asserted in the Petition at issue in this proceeding. By that time, six pathologists (including one engaged by the State), had reached the conclusion that Dr. Dix improperly opined that Wagnon

_____

[11]McKim is incarcerated in the Jefferson City Correctional Center in Cole County, Missouri. Rule 91.02(a) requires habeas petitions to be filed in the county where the petitioner is incarcerated.

8

was asphyxiated or suffocated based solely on the presence of petechiae, and that the toxicology report prepared during the autopsy suggested that Wagnon's cause of death was methamphetamine overdose. None of the pathologists could opine to a reasonable degree of medical certainty about the method of overdose, i.e. whether by accident, suicide, or homicide.

Following an extended evidentiary hearing, Judge Green entered a judgment denying the petition. Judge Green determined that the core of McKim's petition for habeas relief was barred because it had already been denied "with prejudice" by this court and the Missouri Supreme Court. In the alternative, Judge Green held that McKim had not met his burden to establish any of his claims for habeas relief, though he found the testimony of the six pathologists to be credible.

Judge Green concluded in connection with McKim's freestanding and gateway claims of actual innocence that the new evidence from the pathologists did not "adequately address the overwhelming evidence that McKim said he was going to kill [Wagnon], killed her, and then said he killed her, and attempted to create a cover story and to escape the area when he knew he was a suspect." Judge Green also concluded that "[a]ssuming Dr. Dix was wrong and the current experts are right about the cause of death, their evidence still strongly supports McKim's guilt, not his innocence," given McFarland's testimony that she saw McKim draw up a syringe, and heard McKim and Peavler discuss their intention to give Wagnon a lethal overdose before dragging her outside.

9

Judge Green concluded in connection with McKim's gateway claim of cause and prejudice that McKim failed to establish any cause external to the defense that prevented him from challenging Dr. Dix's opinion as to cause of death at trial, on direct appeal, or in his Rule 29.15 proceedings, as all of the evidence relied on by the new pathologists to reach opinions contrary to Dr. Dix's opinion was available at the time of trial.

Finally, Judge Green concluded that McKim's Thirteenth Amendment claim was without merit as it was nothing more than a restatement of his freestanding actual innocence claim.

Following the entry of Judge Green's judgment, McKim filed the Petition in this court. We review the Petition as an original writ. Rule 91.[12]

## II.

**Effect of Prior Appellate Denials of McKim's Petitions for Habeas Relief**

Before addressing the merits of McKim's Petition, we consider the State's contention that we are barred from entertaining McKim's Petition by the operation of Rule 91.22. Rule 91.22 provides that "[w]hen a petition for a writ of habeas corpus has been denied by a higher court, a lower court shall not issue the writ unless the order in the higher court denying the writ is without prejudice to proceeding in a lower court." The State contends that the claims asserted in McKim's Petition are indistinguishable from the claims asserted in McKim's earlier habeas petitions, which claims were denied with prejudice by this court and by the Supreme Court in 2011. We disagree.

---

[12]All references to Rules are to *Missouri Court Rules, Volume I-State, 2014* unless otherwise noted.

This Court's order dated June 29, 2011 denying McKim's earlier habeas petition stated:

> The Petition for Writ of Habeas Corpus filed May 26, 2011, is taken up, and the Court, having considered same, hereby denies said petition.

The Supreme Court's order dated October 25, 2011 denying McKim's earlier habeas petition stated:

> Now at this day, on consideration of the petition for writ of habeas corpus herein to the said respondent, it is ordered by the Court here that the said petition be, and the same is hereby denied.

Neither order stated whether it was entered with, or without, prejudice.

The State argues that we must construe both orders to have been entered "with prejudice" because Rule 91.22 states that unless a writ is denied without prejudice, a successive proceeding in a lower court involving the same habeas claims shall be barred. In short, the State argues that unless an order denying a writ states that it is without prejudice, we are required by Rule 91.22 to deem the order to be a denial with prejudice. We disagree.

Our Supreme Court has held that an appellate court's denial of a writ without the issuance of an opinion "is not a conclusive decision on the merits of the issue presented." *Rodriguez v. Suzuki Motor Corp.*, 996 S.W.2d 47, 61 (Mo. banc 1999). *Rodriguez* involved the denial of a writ of prohibition or mandamus. *Id*. This court applied the holding in *Rodriguez* to a writ of habeas corpus in *Johnson v. Missouri Bd. of Prob. and Parole*, 92 S.W.3d 107 (Mo. App. W.D. 2002). We held that an order denying a writ of habeas corpus is without prejudice unless it expressly states otherwise because

11

"[s]ummary denial of a petition for writ of *habeas corpus* can be for any number of reasons, including, for example, failure to include all necessary documents [] to show entitlement to the writ." *Id.* at 112 (citing *Rodriguez*, 996 S.W.2d at 61) (holding that "there are a number of reasons why the appellate court might decline to review a writ petition on the merits")).

The State contends that this court erroneously applied the holding in *Rodriguez* to writs of habeas corpus. However, there is no logical basis to distinguish between writs of prohibition or mandamus, and writs of habeas corpus. Writs filed in appellate courts, whether pursuant to Rule 84.24 (addressing all writs) or Rule 91 (addressing writs of habeas corpus), are original writs entitled to original review. All writ petitions are subject to strident procedural requirements and are thus frequently dismissed on bases other than the merits.

Moreover, writs filed pursuant to Rule 84.24 and Rule 91 are civil proceedings. Rule 84.24; Rule 91.01(a); *State ex rel. Nixon v. Jaynes*, 63 S.W.3d 210, 216 (Mo. banc 2001) ("Petitions for *habeas corpus* are civil proceedings and, as Rule 91 indicates, are governed by the rules of civil procedure.") (disagreed with on unrelated grounds by *State ex rel. Zinna v. Steele*, 301 S.W.3d 510 (Mo. banc 2001). Rule 67.03 provides that any involuntary dismissal of a civil action "shall be without prejudice ***unless the court in its order for dismissal shall otherwise specify***." (Emphasis added.) The denial of a writ by order, without a hearing, and without the issuance of an opinion explaining the substantive basis for the denial, is tantamount to involuntary dismissal of the writ. Thus,

12

the holding in *Rodriguez*, and the application of that holding to habeas petitions in *Johnson*, is consistent with Rule 67.03.

We conclude, therefore, that an appellate court's or the Supreme Court's issuance of an *order* denying a petition for writ of habeas corpus is without prejudice **unless** the order of denial otherwise specifies.[13] We thus disagree with, and decline to follow, the holding in *Hicks v. State*, 719 S.W.2d 86, 88 (Mo. App. S.D. 1986),[14] where the Southern District held that a Supreme Court order identical to the one which denied McKim's 2011 habeas petition was "with prejudice" because the order did not expressly state that it "was without prejudice to proceeding in a lower court."

Because the 2011 orders entered by this Court and the Supreme Court denying McKim's earlier habeas petitions were without prejudice, McKim's Petition is not barred by the operation of Rule 91.22.[15]

---

[13]In contrast, where a writ is denied by a written opinion (as opposed to an order), it is plainly denied on its merits, and thus with prejudice. "[P]ursuant to Rule 84.24(n) which applies to original writ proceedings in the appellate courts . . . if a petition for writ of habeas corpus is granted or denied by the issuance of an *appellate* opinion . . . any 'further review of the action shall be allowed only as provided in Rule 83 and Rule 84.17.' Rule 83 addresses the transfer of a case from the court of appeals to the Supreme Court. Rule 84.17 addresses post-disposition motions for rehearing, to modify or to publish an opinion filed in court of appeals." *Ferguson v. Dormire*, 413 S.W.3d 40, 50 n. 16 (Mo. App. W.D. 2013) (emphasis in original).

[14]Pursuant to Supreme Court Operating Rule 22.01, and Western District Operating Rule XXXI, the decision not to follow the holding in *Hicks v. State*, 719 S.W.2d 86 (Mo. App. S.D. 1986), has been reviewed and approved by order of this court en banc.

[15]Because McKim's Petition is an original proceeding in habeas corpus, we are not conducting appellate review of Judge Green's judgment denying the identical petition. However, we observe that given our conclusion, Judge Green erroneously held that he was procedurally barred to entertain McKim's habeas petition by the operation of Rule 91.22. It is also instructive to note that although Judge Beetem's 2011 judgment plainly denied McKim's 2010 habeas petition on its merits, a circuit court's judgment denying a habeas petition does not implicate Rule 91.22. Rule 91.22 only applies to bar a *lower* court's consideration of a successive habeas petition when an earlier habeas petition has been denied with prejudice by a *higher* court.

## III.

## Analysis

### A.  Summary of McKim's Habeas Claims

McKim's Petition asserts that new evidence clearly and convincingly establishes his actual innocence, a freestanding claim of actual innocence that would, if established, entitle McKim to a new trial, even if his original trial was free of constitutional defect.

McKim's Petition alternatively argues that the preponderance of the evidence establishes a gateway of either cause and prejudice, or actual innocence/manifest injustice, through which habeas review of procedurally defaulted claims is permitted. McKim contends that through these gateways we should thus entertain the following claims: (i) that Dr. Dix's testimony was perjured; (ii) that the State committed *Brady*[16] violations in connection with Dr. Dix's testimony; (iii) that he received ineffective assistance of counsel given trial counsel's failure to investigate and present evidence of cause of death; (iv) that he received ineffective assistance of counsel given trial counsel's failure to investigate and present additional alibi witnesses; (v) that the State engaged in prosecutorial misconduct in making inappropriate closing argument; (vi) that the State committed a *Brady* violation in failing to disclose that McFarland believed Wagnon died of an overdose; and (vii) that the State failed to establish a *corpus delicti*.[17]

---

[16]*Brady v. Maryland*, 373 U.S. 83 (1963).

[17]McKim acknowledges that all of these claims are procedurally defaulted because they were not raised on direct appeal or in his timely filed Rule 29.15 motion. *State ex rel. Nixon v. Jaynes*, 63 S.W.3d 210, 214 (Mo. banc 2001) (holding that a defendant who fails to raise a challenge to his conviction on direct appeal or in a timely filed post-conviction proceeding "is said to have procedurally defaulted on those claims") (disagreed with on unrelated grounds in *State ex rel. Zinna v. Steele*, 301 S.W.3d 510 (Mo. banc 2001)).

14

Finally, McKim argues that the Thirteenth Amendment has been violated because new evidence establishes he is being held in servitude for a crime that never occurred.

## B.  The Scope of Habeas Relief

Rule 91.01(b) provides that "[a]ny person restrained of liberty within this state may petition for a writ of habeas corpus to inquire into the cause of such restraint."  A habeas petition must state "[f]acts showing that the restraint is illegal or improper."  Rule 91.04(a)(2).[18]  "The relief available under a writ of habeas corpus has traditionally been very limited, and courts are not required to issue this extraordinary writ where other remedies are adequate and available."  *Clay v. Dormire*, 37 S.W.3d 214, 217 (Mo. banc 2000).  In other words, "[h]abeas corpus is not a substitute for appeal or post-conviction proceedings."  *State ex rel. Simmons v. White*, 866 S.W.2d 443, 446 (Mo. banc 1993).  "Thus, it is unusual for a court to consider a prisoner's petition for writ of *habeas corpus* for claims that should have been raised in post-conviction proceedings."  *Jaynes*, 63 S.W.3d at 214.

"Very limited exceptions to this rule are recognized where the person seeks to use the [habeas] writ 'to raise jurisdictional issues or in circumstances so rare and exceptional that a manifest injustice results' if habeas corpus relief is not granted."  *Clay*, 37 S.W.3d at 217 (Mo. banc 2000) (quoting *Simmons*, 866 S.W.2d at 446).[19]

---

[18]Because a petition for writ of habeas corpus is a civil proceeding as to which the rules of civil procedure applies, the petition must comply with Rule 55.05 which "requires that a petition to set forth 'facts' showing that the pleader is entitled to relief."  *Jaynes*, 63 S.W.3d at 216.  "Under *habeas corpus*, the relief that must be sought is a judgment finding that the prisoner is unlawfully confined" pursuant to the standards for habeas relief recognized by Missouri jurisprudence.  *Id*.

[19]Regardless the basis for habeas relief, "[a] writ of habeas corpus does not declare or determine the guilt or innocence of a defendant.  A writ of habeas corpus merely operates to vacate a conviction . . . permitting the State to

*Simmons* did not define "manifest injustice." *Id.* The Missouri Supreme Court in *Clay* provided contour to the principle, and held that "manifest injustice" is essentially the same as a "miscarriage of justice" as that phrase is used in federal habeas cases. *Id.* *Clay* thus held that the "manifest injustice or miscarriage of justice" standard requires the habeas corpus petitioner to show that "'it is more likely than not that no reasonable juror would have convicted him in the light [of new evidence of innocence].'" *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). If this manifest injustice is established, the petitioner would be afforded a gateway to permit review of otherwise barred constitutional claims on the merits. *Id.* (citing *Schlup*, 513 U.S. at 327); *see also McQuiggin v. Perkins*, ___ U.S. ___, 133 S.Ct. 1924, 1935 (2013). "[T]he actual innocence component of the miscarriage of justice standard is 'a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits, [and] . . . [w]ithout any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice. . . . '" *Clay*, 37 S.W.3d at 217 (quoting *Schlup*, 513 U.S. at 315-16, which quotes *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).

Following *Clay*, the Missouri Supreme Court expanded the contours of habeas relief in *Jaynes*, when it held that in addition to jurisdictional issues and manifest injustice demonstrated by evidence of actual innocence, a petitioner could also secure habeas relief by establishing "cause and prejudice." 63 S.W.3d at 215. A "cause and

---

retry the defendant should it so elect." *State ex rel. Koster v. McElwain*, 340 S.W.3d 221, 232 (Mo. App. W.D. 2011) (citing *Schlup v. Delo*, 513 U.S. 298, 319 (1995)).

16

prejudice" habeas claim requires a petitioner to establish that his failure to timely raise a claim on direct appeal or in a post-conviction motion (i.e. his procedural default) was "caused" by "'some objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule.'" *Id*. (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). "To establish the 'prejudice' necessary to overcome procedural default, a petitioner seeking to vacate, set aside, or correct a conviction or sentence . . . bears the burden of showing, not merely that errors at his trial created possibility of prejudice, but that they 'worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Id*. (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).

Thus, current jurisprudence permits habeas relief in Missouri on a showing of a jurisdictional defect,[20] or upon successfully establishing a procedurally defaulted claim of constitutional proportion whose review is secured through the gateway of cause and prejudice or the gateway of manifest injustice/actual innocence. *State ex rel. Amrine v. Roper*, 102 S.W.3d 541, 546 (Mo. banc 2003) (citing *Clay*, 37 SW.3d at 217).[21]

---

[20]Claims that a sentence has been imposed in excess of a trial court's authority traditionally fall into this category and are thus reviewed without the need to establish a "gateway." *See, e.g., Zinna*, 301 S.W.3d at 516-17. The manifest injustice/actual innocence gateway "is of no avail to claims of error committed during the sentencing process." *Clay*, 37 S.W.3d at 218.

[21]The "gateways" of manifest injustice/actual innocence and cause and prejudice do not independently support habeas relief, but are the condition precedent to review of claims of constitutional error that are procedurally barred. *Amrine*, 102 S.W.3d at 546. Evidence establishing the gateway of actual innocence or the gateway of cause and prejudice may overlap with evidence of a procedurally defaulted claim, such that proof of the gateway effectively proves the defaulted claim. *See, e.g., State ex rel. Verweire v. Moore*, 211 S.W.3d 89, 93 (Mo. banc 2006) (where fact that evidence at guilty plea hearing did not establish essential element of crime constituted proof of gateway of actual innocence that met manifest injustice standard for habeas relief while also establishing the procedurally defaulted claim that guilty plea was not knowingly and voluntarily entered); *Ferguson,* 413 S.W.3d at 55 (noting that the withholding of material evidence from the defense may establish the cause and prejudice prongs of the gateway of cause and prejudice while also establishing some of the essential elements of a procedurally defaulted *Brady* violation).

In addition, Missouri recognizes a ***freestanding*** claim of actual innocence.[22] *Amrine*, 102 S.W.3d at 547. Similar to the "gateway" claim of actual innocence, a freestanding claim of actual innocence is also cast in terms of "manifest injustice." Unlike a "gateway" claim of actual innocence, a freestanding claim of actual innocence asserts that newly discovered evidence establishes the likelihood that an innocent person has been convicted, undermining confidence in the correctness of the judgment, even though the petitioner received a fair trial free from constitutional defect. *Id*. Because a freestanding actual innocence claim seeks habeas relief notwithstanding a fair trial, "new evidence" of innocence must clearly and convincingly establish the likelihood that an innocent person has been convicted. *Id*. at 548. This is in contrast to a gateway of actual innocence claim which seeks review of procedurally defaulted claims of constitutional error, and where "new evidence" of innocence need only establish the likelihood that an innocent person has been convicted by a preponderance of the evidence. *Id*. Despite different burdens of proof, freestanding and gateway actual innocence claims depend for their proof on the same "new evidence" of innocence. It is thus axiomatic that if "new evidence" fails to satisfy the preponderance standard required for a gateway actual innocence claim, it will also fail to satisfy the clear and convincing standard required for a freestanding actual innocence claim.

---

[22]Statutory bases to claim innocence also exist that do not implicate habeas jurisprudence. *See, e.g.*, sections 547.035 and 547.037 which address post-conviction forensic DNA testing. Relief afforded by the General Assembly pursuant to these or other similar statutes is available without time limits and without regard to concerns of procedural default, unless otherwise expressed in the statute. *See Jaynes*, 63 S.W.3d at 216, n.6.

## C. McKim's Freestanding and Gateway Actual Innocence Claims

We turn first to McKim's freestanding and gateway actual innocence claims, and begin our discussion by summarizing the "new evidence" McKim relies on to sustain his burdens of proof.

(i) **"New evidence" of actual innocence**

McKim's "new evidence" of actual innocence falls into two categories: (i) new expert opinions about Wagnon's cause of death; and (ii) a book authored by Dr. Dix that was published in 1998.

**The New Expert Witness Opinions**

McKim's habeas record includes the reports, letters, affidavits, and/or testimony of six medical experts, none of whom had been retained at the time of McKim's trial. Five of the experts are McKim's witnesses: Dr. Edward Friedlander, a pathologist; Dr. Edward Adelstein, a pathologist; Dr. Harry Bonnell, a forensic pathologist; Dr. Michael Fishbein, a pathologist; and Dr. John Adams, a forensic pathologist. The sixth witness, Dr. Russell Deidiker, was retained and called as a witness *by the State* in the habeas proceedings. Each of these pathologists reviewed Dr. Dix's autopsy report and Wagnon's toxicology report, both of which were introduced into evidence during McKim's trial. Some of the pathologists reviewed photographs from the autopsy and of the scene where Wagnon's body was found. Each of the pathologists reviewed the transcripts from McKim's and Peavler's trials, and in particular Dr. Dix's testimony in both trials, summarized below.

19

During McKim's trial, Dr. Dix testified that he performed the autopsy on Wagnon. He opined that Wagnon died "as a result of asphyxiation or suffocation." Dr. Dix testified that during the autopsy, he observed petechiae, or "ruptured blood vessels," in the eyes. Dr. Dix testified that although there were injuries to the outside of Wagnon's body,[23] they weren't very severe. He opined that Wagnon "had no other injuries that would have caused death." Dr. Dix explained that petechiae occur when there is a lot of pressure around the neck area that forces the blood into the head. He testified that petechiae are commonly seen in suffocation. Dr. Dix described several manners of suffocation, including strangulation. Dr. Dix testified that he saw no injuries to the neck consistent with "forceful strangulation with the hands." However, Dr. Dix testified that a person can be strangled or suffocated without internal injuries, for example by compression with a forearm. Dr. Dix testified that he ordered the preparation of a toxicology report during the autopsy. The toxicology report reflected the presence of high levels of methamphetamine in Wagnon's blood and urine. Dr. Dix was asked if he found anything in the results of the toxicology report consistent with a cause of death. Dr. Dix testified:

> No. *If I thought [Wagnon] had enough drugs in her system to cause her death, then I would have ruled that as the cause of death*.

(Emphasis added.) Dr. Dix then restated his opinion that Wagnon's cause of death was "asphyxiation by unknown means." Dr. Dix was not cross-examined by McKim's trial

---

[23]The autopsy report revealed several scrapes on Wagnon's face, and a blunt force trauma to the head which produced a slight brain bleed.

20

counsel about his autopsy findings, a strategy that was consistent with McKim's alibi defense that he was not with Peavler and McFarland on the day that Wagnon died.

Peavler's trial was conducted approximately two weeks after McKim's trial. During Peavler's trial, Dr. Dix again testified that Wagnon's death was caused by "asphyxiation or suffocation," a finding he based on the presence of petechiae in Wagnon's eyes. Dr. Dix also testified, as he had in McKim's trial, that Wagnon had no other injuries that would have caused death, despite a bruise under the right eye; a number of scrapes on her face, neck and chin; and a blunt impact injury that caused bleeding on the top of Wagnon's brain on the left side. Dr. Dix acknowledged the presence of methamphetamine in Wagnon's system, but testified that he did not think, *given the rest of the findings on Wagnon's body*, that she died of an overdose.

In contrast to McKim, Peavler's defense was that Wagnon had overdosed, and that McFarland (who frequently cooked and smoked methamphetamine with Wagnon) was attempting to insulate herself from criminal responsibility for Wagnon's death. Dr. Dix's cause of death opinion was thus subject to strident cross-examination during Peavler's trial. Dr. Dix testified on cross-examination that although the death certificate indicated that Wagnon's cause of death was "asphyxiation by unknown method," he believed she was strangled. Dr. Dix admitted that in "very rare instances," other causes of death can cause petechiae, such as sudden heart disease, and certain types of seizures. Dr. Dix admitted that there was a lot of methamphetamine in Wagnon's urine and blood. He testified, however, that when a person uses methamphetamine often (which Wagnon had), the levels were not unusual. Dr. Dix stated that despite the levels of

21

methamphetamine in Wagnon's system, *he did not think that Wagnon died as a result of an overdose.* Dr. Dix was asked about the fact that the date of his autopsy report was May 7, 1997, while the toxicology report was dated May 29, 1997. Dr. Dix explained that he supervised the laboratory, and had called for the toxicology findings before preparing his autopsy report. Dr. Dix was specifically asked: "Now how do we know that [Wagnon] did not die from a fatal arrhythmia due to the amount of methamphetamine in her body?" Dr. Dix responded: "Because I thought she died of asphyxiation. That was my opinion." On redirect examination, Dr. Dix was asked whether it was common to see petechiae in drug overdose cases. He said: "No."

Having reviewed the records and other data available to Dr. Dix, and having reviewed Dr. Dix's testimony during McKim's and Peavler's trial, the six new pathologists reached a cause of death opinion that was contrary to Dr. Dix's. In forming their opinions, the new pathologists did not review information that was unavailable at the time of McKim's trial, and did not rely on scientific standards that were developed after McKim's trial. In other words, the habeas record supports the conclusion that had the six new pathologists been called to testify during McKim's trial in 1999, their testimony would have been the same as it was in the habeas proceeding.

Each of the new pathologists opined that the forensic evidence did not support a conclusion to a reasonable degree of medical certainty that Wagnon's cause of death was asphyxiation or suffocation. Each noted that the presence of petechiae in the eyes is a non-specific condition, rendering it improper to reach a cause of death opinion based solely on that condition. However, the new experts did not contradict Dr. Dix's trial

22

testimony that asphyxiation or suffocation can occur without leaving forensic evidence. Thus, the experts did not opine that Wagnon could not have been suffocated, but rather that the forensic evidence did not support a medical opinion that she had been suffocated.

The six new experts each opined that high levels of methamphetamine in Wagnon's blood and urine suggested to a reasonable degree of medical certainty that Wagnon's cause of death was methamphetamine toxicity. Some of the experts testified that the forensic evidence would also have supported the conclusion that Wagnon's cause of death was "undetermined." All agreed that the *manner* of death by methamphetamine (whether by accident, suicide, or involuntary injection consistent with homicide) could not be stated to any degree of medical certainty. In other words, none of the experts could exclude homicide as the *manner* of Wagnon's death.

Dr. Dix did not testify in McKim's habeas proceedings, as he passed away in 2002. However, Dr. Dix never retracted his trial testimony at any time prior to his death. Though the State retained Dr. Deidiker in response to McKim's Petition, and though Dr. Deidiker's opinion about Wagnon's cause of death is contrary to the State's evidence at trial and to the theory of guilt submitted to the jury, the State has not abandoned its reliance on Dr. Dix's trial testimony. The State argues that Dr. Dix simply reached a different expert opinion from the same data reviewed by new experts. The State points out that Dr. Dix expressly opined during McKim and Peavler's trials that Wagnon did not die from a drug overdose, and that when challenged on cross-examination in Peavler's trial, Dr. Dix expressly disavowed the possibility that Wagnon died of methamphetamine toxicity. The State thus argues that this is simply a classic case of experts who do not

23

agree with one another. The State also argues that new expert opinions are not "new evidence" permissibly considered in a habeas proceeding because the opinions are based on information and scientific standards that were available to McKim at the time of trial.

**Dr. Dix's Book**

McKim also relies on a book authored by Dr. Dix and published in 1998, the year before McKim's trial. In that book, Dr. Dix writes that "It is important to note that petechiae are not specific for asphyxiation and may occur in people who die suddenly from other causes such as heart disease." Jay Dix, M.D. and Robert Calaluce, M.D., GUIDE TO FORENSIC PATHOLOGY, 75-76 (1998). McKim argues that this book proves that Dr. Dix's cause of death opinion was wrong.

The State argues that Dr. Dix's book is not "new evidence" because it was available at the time of McKim's trial, and that had Dr. Dix been challenged on cross-examination with his book, he may well have been able to explain the apparent discrepancy, particularly given his strident defense of his cause of death opinion in Peavler's trial.

(ii)    **Is McKim's evidence "new evidence"?**

We consider the State's claim that McKim's "new evidence" is not new evidence that can be permissibly considered as the evidence was available, and could have been discovered or developed with reasonable diligence, at the time of McKim's trial.

In *Schlup*, the United States Supreme Court broadly described "new evidence" in the context of an actual innocence claim[24] as "new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--***that was not presented at trial***." 513 U.S. at 324 (emphasis added). No United States Supreme Court decision has limited the concept of "new evidence" in the context of actual innocence habeas claims to evidence that could not have been discovered with reasonable diligence at the time of trial. In fact, in *McQuiggin*, the United States Supreme Court held that "new evidence" in connection with an actual innocence habeas claim is any evidence that was "unavailable" at the time of trial without regard to whether the evidence could have been discovered with reasonable diligence at the time of trial, and that the timing of discovery of "new evidence" should not bear on its ability to be considered but instead on "the assessment whether actual innocence has been convincingly shown." 133 S.Ct. at 1935-36.

Our Supreme Court has not deliberated on a definition for "new evidence" in the context of actual innocence habeas claims.[25] However, it has signaled a willingness to treat any evidence that was ***unknown or unavailable*** to a defendant at the time of trial as "new evidence," without regard to whether the evidence could have been discovered or developed with reasonable diligence at the time of trial. In *State ex rel. Engel v. Dormire*, 304 S.W.3d 120, 126 (Mo. banc 2010), the Supreme Court relied on "***new evidence*** developed in [a co-defendant's case] and unknown or unavailable when

---

[24]*Schlup* addressed a gateway actual innocence claim, and not a freestanding actual innocence claim. However, both claims rely on "new evidence."

[25]*Cf. State v. Terry*, 304 S.W.3d 105, 109 (Mo. banc 2010) (addressing "new evidence" in the separate and distinguishable context of a timely filed motion for new trial).

[petitioner] previously sought relief" to afford habeas relief. Indeed, as actual innocence habeas claims are grounded in the concept of "manifest injustice," there is a logical underpinning for viewing "new evidence" as suggested in *Schlup* as any evidence "***that was not presented at trial***." 513 U.S. at 324.

It is not clear on this record that McKim's "new evidence" was either unknown or unavailable at the time of his trial. However, we do not need to resolve whether McKim's claimed "new evidence" is, in fact, "new evidence" we can permissibly consider given that it existed (in the case of Dr. Dix's book) or could have been developed (in the case of the new expert opinions)[26] at the time of McKim's trial. Even presuming we can consider the evidence, McKim's "new evidence" does not persuade us that "it is more likely than not that no reasonable juror would have convicted" McKim. *Clay,* 37 S.W.3d at 217 (citing *Schlup*, 513 U.S. at 327). Because we conclude that McKim's "new evidence" does not satisfy the preponderance standard associated with a gateway claim of actual innocence, we also conclude that McKim has failed to sustain his burden to clearly and convincingly establish a freestanding claim of actual innocence.[27]

---

[26]The six new pathologists who testified in connection with McKim's habeas proceedings formed their opinions based solely on evidence known, available, and largely introduced during McKim's trial. Under similar facts, other courts have concluded that new expert opinions formulated from evidence available and admitted at the time of trial are not new evidence. *See Hamborsky v. Winstead*, Civil Action No. 12-746, 2013 WL 3733480 at \*7 (W.D.Pa. July 16, 2013) (holding new expert opinions based on evidence admitted at trial is not truly new evidence, though it should be noted this conclusion depended on a finding that the new opinion could have been developed with the exercise of reasonable diligence at the time of trial); *Griffin v. Strickman*, No. Civ.A, 04-975, 2004 WL 1821142 at \*8 (E.D.Pa. August 11, 2004) (holding that new expert opinion based on autopsy report introduced at trial is not "new" evidence).

[27]Our discussion and denial of McKim's freestanding actual innocence claim on its merits should not be read to presume that such a claim is even cognizable in a non-capital case, a question that is unresolved in Missouri. In *Amrine*, where the Supreme Court first recognized a freestanding actual innocence claim, the defendant had been sentenced to the death penalty. 102 S.W.3d at 543. The Court observed that the prospect of a freestanding actual innocence claim was first recognized in *Herrera v. Collin*s, 506 U.S. 390, 417 (1993), where the United States Supreme Court held that "***in a capital case*** a truly persuasive demonstration of actual innocence made after trial would render the execution of a defendant unconstitutional and warrant federal habeas relief if there were no state

(iii) **McKim's "new evidence" does not sustain his burden to establish by a preponderance or clearly and convincingly that no reasonable juror would have convicted him**

McKim was convicted of murdering Wagnon by suffocation. The evidence supporting his conviction included Dr. Dix's expert opinion that Wagnon's cause of death was suffocation by undetermined means. This was not the only evidence supporting McKim's conviction, however.

Contrary to McKim's alibi defense, Kandi testified that she arrived home to find McKim, Wagnon, Peavler, and McFarland shortly before Wagnon's death, and that she heard an argument that led her to believe that Wagnon was in trouble. McFarland graphically testified about the physical altercation between Wagnon, Peavler, and McKim, that led to Wagnon's violent removal from Peavler's house *in a headlock*. Yearns told police that McKim told her that Wagnon had been *strangled*, and that after learning he was wanted, McKim asked her to take him "up North." Cooper testified that McKim told him that Wagnon was a snitch; that the only good snitch is a dead snitch; and that Wagnon died in a *chokehold* McKim applied. Western testified that four days before Wagnon died, McKim told her that he would kill Wagnon if he found out that she was a snitch. Wagnon's mother testified that McFarland and Wagnon argued the night of

---

avenue open to process such a claim." *Amrine,* 102 S.W.3d at 546 (emphasis added). Our Supreme Court noted its statutory obligation in **capital cases** to determine "not merely the sufficiency but also the 'strength of the evidence.'" *Id*. at 547 (citing section 565.035.3). The Court then held that "it is incumbent upon the courts of this state to provide judicial recourse to an individual who, after the time for appeals has passed, is able to produce sufficient evidence of innocence to undermine the habeas court's confidence in the underlying judgment that resulted in defendant's conviction **and sentence to death**." *Id*. (emphasis added). This discussion could be read to limit freestanding claims of actual innocence to capital cases. Our Supreme Court has yet to definitively address whether a freestanding actual innocence claim is cognizable in a non-capital case.

the murder because Wagnon was preparing to testify in a drug prosecution involving McFarland's boyfriend.

McKim's new evidence does contradict Dr. Dix's cause of death opinion. However, the new evidence does not discredit, impeach, or negate the testimony of McFarland, Yearns, Kandi, Cooper, or Western.

Certainly, had the jury heard the new evidence, it would have been required to resolve the conflicting forensic opinions. We cannot conclude, however, that in doing so "it is more likely than not that no reasonable juror would have convicted" McKim. *Clay,* 37 S.W.3d at 217. Rather, a reasonable juror could have resolved the conflicting forensic opinions by resorting to the non-medical testimony of McFarland, Yearns, Kandi, Wagnon's mother, Cooper, and Western, all of which combined to support the reasonable inference that McKim murdered Wagnon by suffocation because he believed she was a snitch. A reasonable juror could have drawn the inference that McKim suffocated Wagnon without leaving definitive forensic evidence of his act at a time when Wagnon happened to have a potentially lethal dose of methamphetamine in her system[28] in light of the fact that the new experts discredit the ***forensic*** basis for Dr. Dix's cause of death opinion, but do not contradict Dr. Dix's testimony that suffocation can occur without leaving forensic evidence.[29]

---

[28]In fact, this appears to be exactly what occurred in Peavler's trial. There, defense counsel aggressively challenged Dr. Dix's cause of death opinion, and argued that Wagnon actually died of an overdose given the high levels of methamphetamine in her system as reflected on the toxicology report. The jury plainly rejected the overdose argument, despite counsel's impeachment of Dr. Dix's cause of death testimony by cross-examination.

[29]The State argues that even were we to conclude that the jury would likely have believed that Wagnon died of a methamphetamine overdose, McKim is not entitled to habeas relief because: (i) none of the new experts could rule out the possibility that the ***manner*** of Wagnon's death by methamphetamine overdose was by homicide; and (ii) McFarland testified during McKim's trial that she saw McKim draw up a syringe and heard both Peavler and

28

McKim argues that the new expert opinions discredit the testimony of McFarland, Yearns, Kandi, Western, and Cooper. We disagree. The "new evidence" does not directly or indirectly impeach or discredit the testimony of these witnesses. And none of the witnesses has recanted his or her trial testimony, notwithstanding the new cause of death opinions. McKim's Petition is replete with unsupported contentions that these non-medical witnesses were manipulated by the authorities to testify in a manner that "fit" Dr. Dix's cause of death opinion. However, there is no evidence to support this bare assertion, and the "new evidence" identified by McKim does not tend to prove or disprove this assertion. Rather, the assertion rehashes similar unsuccessful attacks on the credibility of these witnesses during McKim's trial.

Moreover, we are required to consider the effect of the "new evidence" in the context of "all the evidence, old and new, incriminating and exculpatory," viewing the record as a whole to "make a probabilistic determination about what reasonable, properly instructed jurors would do." *House v. Bell*, 547 U.S. 518, 538 (2006). The body of evidence includes evidence supporting McKim's alibi defense, wherein McKim steadfastly claimed that he was not present at Peavler's house with Peavler and

---

McKim threaten to kill Wagnon by overdose. The State did not charge McKim with murdering Wagnon by injection of methamphetamine. It charged McKim with murdering Wagnon by suffocation. The jury convicted McKim of the specific crime charged by the State, and was never asked to determine whether McKim murdered Wagnon in some other manner. Because we conclude that McKim has not met his burden to prove freestanding or gateway actual innocence of the specific crime of which he was convicted, we need not address whether the State can permissibly defend a habeas claim by arguing that the evidence would have supported a conviction on a theory not charged or submitted to the jury. *Cf. McCormick v. United States*, 500 U.S. 257 (1991) (holding that a court on appeal cannot affirm a conviction on a legal or factual ground never submitted to the jury).

McFarland on the day of Wagnon's death.[30]  McKim's alibi defense did not turn on, and would not have been advanced by arguing about, Wagnon's cause of death.  The jury did not accept McKim's alibi defense.  We are thus not persuaded that competing expert opinions about Wagnon's cause of death would have persuaded the jury to accept McKim's alibi defense, particularly as the new expert opinions merely discredit Dr. Dix's *forensic* opinion about cause of death, but do not discredit Dr. Dix's opinion that suffocation can occur without leaving forensic evidence.

McKim also argues that the "new evidence" demonstrates that the State failed to establish a *corpus deliciti*--i.e. "that a crime [in this case murder] was committed by *someone,* independent from a defendant's extrajudicial statements."  *State v. Madorie*, 156 S.W.3d 351, 354 (Mo. banc 2005) (emphasis in original).  Though couched in terms of "evidence" of actual innocence, McKim's claim is in reality a procedurally defaulted claim that the State violated his right to due process by failing to establish a *corpus delicti*.  Assuming, *arguendo*, that the alleged failure to establish *corpus deliciti* is independently relevant in assessing whether an actual innocence claim has been established, we find no merit in McKim's contention.  Even were we to disregard Dr. Dix's testimony, McFarland's eye-witness testimony, Kandi's testimony placing McKim at the scene and about overhearing an argument with Wagnon, and the circumstances involving the discovery and condition of Wagnon's body,[31] all combine to satisfy the

---

[30]McKim's reliance on an alibi defense continues in this habeas proceeding.  One of the procedurally defaulted claims McKim asks us to review through the gateway of actual innocence or cause and prejudice is the claim that trial counsel failed to call several witnesses who would corroborate his alibi.

[31]Wagnon's body had external scrapes and contusions consistent with a struggle.  She was found by the side of a dirt road.  She was wearing no shoes despite frigid temperatures.  The soles of her socks were clean suggesting

State's threshold obligation to establish that Wagnon was murdered in some manner by *someone*. *See State v. Edwards*, 116 S.W.3d 511, 544 (Mo. banc 2003) ("The *corpus delicti* in a homicide case consists of two elements: (1) proof of the death of the victim and (2) evidence that the criminal agency of another was the cause of the victim's death."). Once that threshold was met, McKim's extrajudicial statements implicating him in committing a crime, and suggesting the manner in which he committed the crime, became admissible to support the specific charge tendered to the jury. *Madorie*, 156 S.W.3d at 356 ("[T]he State is not required to present independent proof of the defendant's criminal agency, outside of the defendant's admissions, to establish the corpus delicti."). McKim's new evidence contradicting Dr. Dix's cause of death opinion does not demonstrate that the State failed to sustain its burden to establish a *corpus delicti*.

We are mindful that McKim was convicted of first degree murder based on a charge and a verdict director that posited a cause of death by suffocation that is now contradicted by six new experts, including an expert retained by the State.[32] Because the State charged and submitted the case against McKim specifying suffocation as the cause of Wagnon's death, it was, of course, the State's burden to prove that assertion. However,

---

she was dumped and did not voluntarily walk to her location. Her clothing was disheveled. She was clutching hairs in one of her hands.

[32]Though the State retained an expert in response to McKim's habeas allegations, and though that expert agreed with McKim's experts that (i) Dr. Dix should not have concluded that Wagnon was suffocated based solely on the presence of petechiae; and (ii) Wagnon likely died of a methamphetamine overdose; the State has not disavowed Dr. Dix's contrary opinion, and has not disavowed that McKim was properly charged with and convicted of suffocating Wagnon. The presence of competing cause of death evidence, *even when presented by the State*, does not negate the State's ability to select amongst competing theories of death, and to try and prove its case accordingly. *See, e.g., Burke v. Mann*, No. 93-CV-5017 (RR), 1995 WL 860755 at *9-12 (E.D.N.Y. December 4, 1995) (holding in habeas case that State's introduction at trial of medical expert's opinion that cause of death was strangulation based on review of an autopsy report, and the autopsy report itself where the performing pathologist found the cause of death to be exposure to the cold, did not require the conclusion that the State disproved its own case or failed to establish guilt beyond a reasonable doubt, but instead reflected "the jury's role as the ultimate finder of fact").

31

forensic evidence establishing a cause of death is not essential to a murder conviction. *State v. Croka*, 693 S.W.2d 133, 134 (Mo. App. W.D. 1985) ("The rule is that expert testimony from a physician is not required in all cases to prove the cause of death."). Non-medical evidence in the form of McKim's extra-judicial statements supports the cause of death tendered to the jury, as does the uncontradicted testimony of Dr. Dix that suffocation can occur without leaving forensic evidence. Dr. Dix's cause of death opinion has not been withdrawn or recanted, and is coupled with his testimony expressly disavowing drug overdose as the cause of death. The evidence (including the competing expert opinions) supports a reasonable inference that Wagnon was suffocated when she had a potentially lethal dose of methamphetamine in her system. In short, though new experts now offer a competing cause of death opinion, this is simply not a case where no evidence exists to support McKim's conviction on the factual and legal theory submitted to the jury. McKim has not established by a preponderance, or clearly and convincingly, that "it is more likely than not that no reasonable juror would have convicted" him. *Clay*, 37 S.W.3d at 217.

Our conclusion is consistent with the outcomes reached in other cases where habeas claims based on new expert opinions challenging trial evidence about the cause of death have been denied. In *Burke v. Mann*, a habeas petitioner had been charged with and convicted of murder by "strangling and beating" a victim. No. 93-CV-5017 (RR), 1995 WL 860755 at *2 (E.D.N.Y. December 4, 1995). The conviction was supported by the cause of death opinion of a medical examiner, who based his opinion on a review of an autopsy report prepared by a different pathologist and photographs of the victim's

32

body. *Id*. at *3. Specifically, the State's medical expert testified that the victim "died as a result of ligature exstrangulation [sic] and that [the victim's] body became frozen after death." *Id*. The medical examiner admitted during cross-examination that nothing in the autopsy report "revealed specifically" that the victim's death was "caused by strangulation." *Id*. at *4. However, a rope had been found wrapped around the victim's neck, and a red mark appeared on the victim's neck. *Id*. at *3. The State's medical expert acknowledged that the pathologist who performed the autopsy concluded that the victim died of cold exposure, but expressed his disagreement with that opinion. *Id*. at *4. "Other evidence of petitioner's involvement in the murder was scarce." *Id*. The petitioner sought habeas relief alleging ineffective assistance of counsel because trial counsel did not call the pathologist who performed the autopsy as a witness. *Id*. at *2, 13. Though the habeas petition asserted a claim of ineffective assistance of counsel, similar to an actual innocence claim, the petitioner's ability to establish *Strickland*[33] prejudice required him to demonstrate by a preponderance of the evidence that he would not have been convicted had the pathologist been called as a witness. The court's explanation of its denial of the petitioner's claim is thus instructive:

> Even if Dr. Wald or another pathologist had taken the stand to rebut Dr. Baden's testimony, petitioner has not demonstrated that there is a "reasonable probability" that the verdict would have been different. The reasons for Dr. Wald's conclusion had already been explained in detail in the autopsy report, which was in evidence. Although Dr. Wald would likely have elaborated on his reasoning and provided a more thorough critique of Dr. Baden's findings, the court is not convinced that Dr. Wald's testimony would have added sufficiently to the autopsy report to have altered the verdict. There still would have been no physical evidence, such

---

[33]*Strickland v. Washington*, 466 U.S. 668 (1984).

33

as a bullet through the heart, to demonstrate conclusively how [the victim] died. The cause of death still would have been open to considerable question. The jury still would have been asked to resolve a dispute between two experts, each defending his view as the most plausible explanation of the cause of death.

*Id.* at \*18. Similarly, in the instant case, the jury knew that Wagnon's toxicology report reflected methamphetamine in her system, and that Dr. Dix did not believe Wagnon died of a drug overdose. Had the jury heard from the new experts positing drug overdose as a cause of death, the situation would have been very similar to that which occurred in the trial in *Burke,* supporting the conclusion that McKim has not established his actual innocence by a preponderance of the evidence.

In *Robbins v. Texas*, a habeas petitioner had been charged with and convicted of capital murder in causing the death of a child "by asphyxiating [her]." 350 S.W.3d 446, 448 (Tex.Crim.App. 2011). The conviction was supported in part by the testimony of the medical examiner that performed the autopsy on the child. *Id.* at 450-51. The medical examiner testified that the cause of death was "asphyxia due to compression of the chest and abdomen and that the manner of death was homicide." *Id.* at 450. The opinion was based on the "presence of petechiae on the back of the thymus and lungs." *Id.* The medical examiner expressly ruled out the performance of CPR as the cause of death. *Id.* The jury heard from the defendant's expert who testified that the victim's cause of death could not be determined because "no anatomical reason demonstrated during the autopsy could have led to a specific cause of death." *Id.* at 451. Specifically, the defendant's expert testified petechiae observed on internal organs of the victim were a "'non-specific finding' and could have resulted from other causes." *Id.* In addition, the jury heard other

34

evidence suggestive of the petitioner's guilt including a personality change in the months preceding the victim's death; that the child victim had become afraid of the petitioner and had suffered at least three injuries while in the petitioner's care; that the child was in good health and was alone with the petitioner shortly before she died; that the petitioner was in a rush to leave the house when his girlfriend returned home; and that the petitioner spoke of feelings of guilt. *Id*. at 458-59. The petitioner alleged an actual innocence claim in his habeas petition, relying on new evidence that the State's medical examiner changed her opinion and could no longer stand behind her trial testimony. *Id*. at 457-58. His freestanding actual innocence claim was rejected because:

> Applicant has failed to prove that the new evidence unquestionably establishes his innocence. [The State's medical examiner] can no longer stand by her trial testimony, but rather than completely retracting her trial opinion, she is of the current opinion that the cause and manner of [the victim's] death are "undetermined." [The State's medical examiner] cannot rule out her trial opinion as a possibility of how [the victim] died. Hence [her] re-evaluation falls short of the requisite showing for actual innocence. . . .
>
> Our conclusion is evident when [the State's medical examiner's] opinion is placed in the context of the trial record, including [the petitioner's expert's] opinion (which the jury heard at trial and did not believe) and the non-medical evidence.

*Id*. at 458. Similarly, in the instant case, some of the new experts also supported an opinion that Wagnon's cause of death was "undetermined." Though all of the new experts opined that the forensic evidence suggested methamphetamine overdose as the cause of death, Dr. Dix expressly testified that Wagnon did not die of a drug overdose. None of the experts challenged Dr. Dix's opinion that suffocation can occur without leaving forensic evidence. The non-medical evidence supported Dr. Dix's opinion that

35

Wagnon was suffocated. As in *Robbins*, McKim has failed to make an actual innocence showing because "it remains at least possible that [Wagnon's] death could have occurred as [Dr. Dix] originally testified." *Id.* at 459.

For the reasons herein explained, we conclude that McKim has not sustained his burden to establish by a preponderance or clearly and convincingly that no reasonable juror would have convicted him. McKim's freestanding and gateway actual innocence claims are denied.

### D. McKim's Gateway Cause and Prejudice Claim

McKim claims that he has established by a preponderance of the evidence the gateway of cause and prejudice permitting review of his procedurally defaulted claims of constitutional error. "[T]he gateway of cause and prejudice is claim specific, and operates to relieve the bar of procedural default only as to claimed constitutional infirmities for which cause and prejudice have been established." *State ex rel. Koster v. McElwain*, 340 S.W.3d 221, 247 (Mo. App. W.D. 2011).

In his Petition, McKim claims that the "cause" prong for the cause and prejudice gateway is established by the fact that McKim did not learn that other pathologists disagreed with Dr. Dix's opinion about Wagnon's cause of death until 2010 when Peavler sent him copies of materials he had received. This does not qualify as "cause."

"Cause" relates to the petitioner's explanation for failing to timely assert a procedurally defaulted claim. "The United States Supreme Court explained that the 'cause' of procedural default 'must ordinarily turn on whether the [petitioner] can show that some objective factor external to the defense impeded counsel's efforts to comply

36

with the State's procedural rule.'" *Jaynes*, 63 S.W.3d at 215 (quoting *Murray*, 477 U.S. at 488).

Nothing in McKim's Petition establishes that McKim's trial counsel was impeded in his ability to challenge Dr. Dix's cause of death opinion within the time frames required for direct appeal or McKim's Rule 29.15 motion. The autopsy report and the toxicology report were in McKim's possession, and were in fact introduced during his trial. For reasons we have previously explained, it appears that trial counsel made a strategic decision not to challenge Dr. Dix's autopsy findings during McKim's trial as McKim's theory of defense did not depend upon Wagnon's cause of death, but relied exclusively on the claim that McKim was not with Peavler or McFarland on the day Wagnon died. McKim's current claim that he did not know that there was an issue with Dr. Dix's cause of death opinion until 2010 may be accurate, but that fact is not a function of a cause "external to the defense."[34]

Though not argued by McKim as demonstrative of "cause," three of the procedurally defaulted claims McKim asks us to review if a gateway to do so is established implicate the "cause" prong for the gateway of cause and prejudice. McKim's Petition claims (i) that Dr. Dix's testimony was perjured; (ii) that the State committed *Brady* violations in connection with Dr. Dix's testimony by failing to disclose the book authored by Dr. Dix and notes from Dr. Dix's file; and (iii) that the State committed a

---

[34]Our holding in *Perkey v. State*, 68 S.W.3d 547 (Mo. App. W.D. 2001) actually demonstrates this point. In that case, we held that a defendant established Rule 29.15 ineffective assistance of counsel claim where trial counsel failed to interview and call decedent's treating physician as a witness at trial and would have testified that decedent had extensive health problems such that it could not be said that her death had been caused by an automobile accident with the defendant, contradicting the State's medical expert at trial [who happened to be Dr. Dix] who testified that the victim would not have died of cardiac arrest but for the accident.

*Brady* violation by failing to disclose McFarland's belief that Wagnon died of an overdose. The State's knowing use of perjured testimony can constitute cause external to the defense sufficient to establish the "cause" prong of the gateway of cause and prejudice, while also serving as the procedurally defaulted claim to be reviewed if the gateway is established. *See, e.g.*, *State v. Albanese*, 9 S.W.3d 39, 50 (Mo. App. W.D. 1999) ("As a general rule 'a conviction which results from the deliberate or conscious use by a prosecutor of perjured testimony violates due process and must be vacated.'") (quoting *State v. Mims*, 674 S.W.2d 536, 538 (Mo. banc 1984)). Similarly, the "cause" prong of the gateway of cause and prejudice is partially coextensive with one of the essential elements of a *Brady* violation. *Ferguson v. Dormire*, 413 S.W.3d 40, 54 (Mo. App. W.D. 2013). Affording McKim's Petition a liberal reading, we therefore address whether these assertions establish "cause" for purposes of the gateway of cause and prejudice.

McKim claims that Dr. Dix's testimony was perjured because: (i) determining a cause of death by asphyxiation based solely on petechiae is inconsistent with the practice of forensic pathology according to the new expert opinions; and (ii) Dr. Dix authored a book in 1998 (the year before McKim's trial) where he wrote that "[i]t is important to note that petechiae are not specific for asphyxiation and may occur in people who die suddenly from other causes such as heart disease;"[35] and (iii) Dr. Dix falsely testified that he considered Wagnon's toxicology reports before preparing the autopsy report. We disagree.

---

[35] Jay Dix, M.D. and Robert Calaluce, M.D., GUIDE TO FORENSIC PATHOLOGY, 75-76 (1998).

First, the fact that new expert opinions are inconsistent with Dr. Dix's expert opinion does not establish that Dr. Dix perjured himself. Disagreement among experts' opinions does not establish that one opinion is perjured.

Second, though Dr. Dix wrote "that petechiae are not specific for asphyxiation" that does not establish that Dr. Dix's opinion about Wagnon's cause of death was perjured. At best, Dr. Dix's book would have provided a basis to cross-examine Dr. Dix about his opinion. Had that cross-examination occurred, Dr. Dix may well have explained that because he could not attach the presence of petechiae to any other condition observed on Wagnon's body,[36] and because it appeared obvious to him that Wagnon had been involved in some sort of a struggle, he believed it appropriate to opine that her cause of death was suffocation. Consistent with this possibility, when Dr. Dix's cause of death opinion was challenged on cross-examination during Peavler's trial, Dr. Dix staunchly defended his opinion, and expressly rejected methamphetamine toxicity as a cause of death *given the condition of Wagnon's body*.

Third, although Dr. Dix testified during McKim's trial that he sent blood and urine specimens to the laboratory for testing in connection with Wagnon's autopsy, he was never asked specifically about the results of the toxicology report, or whether he had the results of that report before preparing the autopsy report. Dr. Dix cannot be said to have perjured himself in McKim's case with respect to testimony he never gave.

---

[36]In Peavler's trial, Dr. Dix was expressly asked on redirect examination whether petechiae appear with excessive drug use. He responded "No." Some of the new experts opined otherwise. That, however, is not material to a discussion about whether Dr. Dix perjured himself.

39

McKim has not established that Dr. Dix perjured himself at trial. Moreover, even if we felt otherwise (which we do not), McKim has offered absolutely no evidence suggesting the State consciously or deliberately used Dr. Dix's testimony knowing it to be perjured. *Albanese*, 9 S.W.3d at 50 ("As a general rule 'a conviction which results from the deliberate or conscious use by a prosecutor of perjured testimony violates due process and must be vacated.'") (quoting *Mims*, 674 S.W.2d at 538). Dr. Dix's testimony does not establish "cause" pursuant to the gateway of cause and prejudice.

McKim also argues that the State committed *Brady* violations by failing to disclose: (i) the book authored by Dr. Dix; and (ii) notes from Dr. Dix's file verifying that he contacted the laboratory to orally obtain the toxicology results before preparing his autopsy report; and (iii) that McFarland repeatedly told investigators before McKim's trial that she believed Wagnon died of an overdose. We disagree.

First, McKim cites no authority imposing an obligation on the State to produce books or articles authored or written by a person the State intends to call as an expert witness at trial when those materials were not authored in connection with the case. We recognize that "Brady provides that 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" *Engel*, 304 S.W.3d at 127 (citing *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). A medical examiner acts on the government's behalf in a case, charging the prosecutor with constructive knowledge and possession of *evidence* known to that witness. However, we are aware of no authority which holds that a book authored by a medical examiner from which potential impeachment material might be extracted,

constitutes "evidence" the State is presumed to possess. *Merriweather v. State*, 294 S.W.3d 52, 55-56 (Mo. banc 2009) (holding that the State has no "affirmative duty . . . to take action to discover information which it does not possess.") (citations omitted). Rather, published materials, even those published by a person deemed to be an agent of the State, are in the public domain, and are thus readily available to a defendant. "[T]here can be no *Brady* violation where the defendant knew or should have known of the material or where the information was available to the defendant from another source." *State v. Moore*, 411 S.W.3d 848, 855 (Mo. App. E.D. 2013); *see also U.S. v. Rodriguez*, 162 F.3d 135, 147 (1st Cir. 1998) (holding there can be no *Brady* violation where "necessary facts for impeachment are readily available to a diligent defender"); *Bell v. Bell*, 512 F.3d 223, 236 (6th Cir. 2008) (holding there can be no *Brady* violation where undisclosed evidence "was a matter of public record"). The alleged failure to disclose Dr. Dix's book does not constitute "cause" under the cause and prejudice gateway.[37]

Second, McKim's complaint that the State failed to disclose notes in Dr. Dix's file is without merit. In Peavler's trial, Dr. Dix was cross-examined about the fact that the toxicology report is dated several days after the autopsy report. Dr. Dix testified that he

---

[37]Even if we concluded that the State had an obligation to disclose Dr. Dix's book as to support finding "cause" pursuant to the cause and prejudice gateway, we would not find that the "prejudice" prong for the gateway has been established. "Prejudice" for the cause and prejudice gateway is coextensive with the prejudice which must be shown to establish a *Brady* violation. *Engel*, 304 S.W.3d at 126. To establish *Brady* prejudice, McKim must establish that in the absence of disclosure of Dr. Dix's book, he did not receive a fair trial, "understood as a trial resulting in a verdict worthy of confidence," because there is a reasonable probability a different result would have been reached had the jury heard the undisclosed evidence. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). We have already explained that had Dr. Dix been confronted with the passage from his book, he may well have explained, as he did in Peavler's case, that he was influenced in his cause of death opinion by the fact that he did not believe a drug overdose to be the cause of death given the condition of the body, and that the condition of the body and its location supported a conclusion of death by other than natural means. In light of all of the evidence in this case, we are not persuaded that there is a reasonable probability that McKim would have received a different result at trial had the jury heard the passage from Dr. Dix's book relied on by McKim.

41

called the laboratory to secure the toxicology results before his autopsy report was prepared. McKim speculates that notes to this effect must have been made by Dr. Dix. However, no notes have been discovered, and no witness testified in the habeas proceedings that notes were prepared and were missing. The premise of McKim's *Brady* claim fails. It is axiomatic that the State cannot be faulted for failing to produce materials that do not exist.

Third, McKim claims that the State failed to disclose several occasions during its investigation where McFarland reported her belief that Wagnon died of a drug overdose. Even presuming McKim's assertion is correct, McFarland testified during McKim's trial that she saw McKim draw up a syringe of fluid and threaten, along with Peavler, to kill Wagnon by injecting her to make it appear to be an overdose. No *Brady* violation can occur when the defense knows about allegedly undisclosed evidence at the time of trial. *Barton v. State*, 432 S.W.3d 741, 763 (Mo. banc 2014).

For the reasons herein explained, McKim has not established the "cause" prong of the gateway of cause and prejudice. We need not address, therefore, the prejudice prong. McKim's gateway claim of cause and prejudice is denied.

### E. The Procedurally Defaulted Claims of Constitutional Error

Because no gateway to do so has been established, we are not permitted to address the procedurally defaulted claims of constitutional error raised in McKim's Petition.

### F. McKim's Thirteenth Amendment Claim

Finally, McKim's Petition alleges that he is incarcerated in violation of the Thirteenth Amendment of the United States Constitution because the new expert opinions establish that there was no crime, rendering his incarceration "involuntary servitude."

No authority has recognized a claimed violation of the Thirteenth Amendment violation to be a freestanding basis for securing habeas relief. Even were it, the genesis of McKim's claim is indistinguishable from McKim's freestanding and gateway actual innocence claims which we have already denied. Alternatively, McKim's Thirteenth Amendment claim is simply a procedurally defaulted claim of constitutional error that cannot be reviewed except through the gateway of actual innocence or cause and prejudice, neither of which is established on this habeas record.

McKim's Thirteenth Amendment claim is denied.

### Conclusion

McKim has not met his burden to establish a freestanding claim of actual innocence. McKim has not met his burden to establish the gateway of either actual innocence or of cause and prejudice as to permit review of procedurally defaulted claims of constitutional error depriving him of a fair trial. McKim's Thirteenth Amendment is not independently cognizable or meritorious, and is a procedurally defaulted claim that is not subject to review. McKim's Petition is denied with prejudice.

_Cynthia L. Martin_
Cynthia L. Martin, Judge

All concur

43