

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| TIMOTHY S. WILLBANKS, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| | ) | **WD77913** |
| v. | ) | |
| | ) | |
| | ) | **OPINION FILED:** |
| | ) | October 27, 2015 |
| MISSOURI DEPARTMENT OF | ) | |
| CORRECTIONS, | ) | |
| | ) | |
| Respondent. | ) | |

**Appeal from the Circuit Court of Cole County, Missouri
The Honorable Daniel R. Green, Judge**

**Before Division Three:** Karen King Mitchell, Presiding Judge, and
Lisa White Hardwick and Anthony Rex Gabbert, Judges

Timothy Willbanks appeals the grant of the Department of Corrections (DOC) motion for judgment on the pleadings in his declaratory judgment action. Willbanks sought a declaration that Missouri statutes and regulations imposing mandatory minimum prison terms before parole eligibility are unconstitutional, as applied to juveniles, under the United States Supreme Court's holding in *Graham v. Florida*, 560 U.S. 48 (2010), when the statutes and regulations operate to deny a juvenile a parole eligibility date outside of his natural life expectancy. Because *Graham*

is inapplicable to Willbanks's multiple, consecutive, term-of-years sentences, the trial court committed no error in granting DOC's motion for judgment on the pleadings.[1]

## Background

On January 28, 1999, Willbanks (then age 17) approached the victim, a 24-year-old woman just returning home from work, in the parking lot of her apartment complex. Willbanks was carrying a sawed-off shotgun. When the victim saw it, she begged him to take her car, her purse, and her money, but to leave her alone. Willbanks ordered the victim back into the driver's seat of her car, while he sat in the back seat and directed her to drive to an ATM, where, using the victim's card and number, Willbanks removed all of the money from her account. The victim repeatedly begged Willbanks not to hurt her, and he responded by threatening to do just that if she continued begging.

After leaving the ATM, Willbanks directed the victim to drive toward the river, but when she reached a "Y" intersection, she turned the wrong way, and Willbanks became angry and told her to stop the car. Willbanks then forced the victim into the trunk so that he could drive. Willbanks drove recklessly, causing the victim to be tossed about the trunk; Willbanks yelled at her to stop moving around so much. Willbanks then ate some fast food the victim had in the car and criticized the victim, saying, "bitch, there's nothing on this cheeseburger."

While in the trunk, the victim removed her jewelry and tried to hide it, in hopes that Willbanks would not find it. After Willbanks finally stopped the car, he let the victim out of the trunk and demanded that she turn over her jewelry. When the victim indicated that she wasn't wearing any, Willbanks made her climb back into the trunk and retrieve the jewelry she had

---

[1] This decision is limited to cases involving multiple term-of-year sentences imposed for multiple offenses and does not address cases involving a single term-of-year sentence imposed for only one offense.

hidden. Willbanks also took her coat, purse, wallet, phone, credit cards, driver's license, and social security card.

Two other individuals (then ages 19 and 20), who had been at the victim's apartment parking lot with Willbanks, had followed Willbanks and the victim in their own car. Willbanks told the other two men that he wanted to shoot the victim, but the other two wanted to leave her alone. Nevertheless, Willbanks directed the victim to turn around and walk toward a tree; as she walked, Willbanks shot her four times, striking her right arm, shoulder, lower back, and head. The victim fell on the river bank, and Willbanks left her for dead. Willbanks later told a friend that he had shot as many times and as fast as he could and that he liked the way the victim screamed.

Despite receiving numerous severe injuries, the victim was able to crawl for forty minutes to find help. Though she survived, she suffered many disfiguring and irreparable injuries.

Willbanks was apprehended, and he was charged and convicted by a jury of one count of kidnapping, one count of first-degree assault, two counts of first-degree robbery, and three counts of armed criminal action. The court sentenced Willbanks to consecutive terms of fifteen years for kidnapping, life imprisonment for assault, twenty years for each robbery count, and one hundred years for each armed criminal action count, for an aggregate sentence of life plus 355 years. According to Willbanks, because of both statutory and regulatory mandatory minimum sentencing requirements preceding parole eligibility, he will not be eligible for parole until he is approximately 85 years old. According to actuarial statistics from the Center for Disease Control, a person with Willbanks's characteristics is not expected to live beyond age 79.5.

Willbanks's convictions and sentences were affirmed on direct appeal, *State v. Willbanks*, 75 S.W.3d 333 (Mo. App. W.D. 2002); as was the denial of his post-conviction relief motion under Rule 29.15, *Willbanks v. State*, 167 S.W.3d 789 (Mo. App. W.D. 2005).

Beginning in 2005, the United States Supreme Court issued a series of opinions addressing the constitutionality of various sentencing practices as they related to juvenile offenders. The first in the series was *Roper v. Simmons*, 543 U.S. 551 (2005), wherein the Court declared that the execution of those who were under the age of 18 at the time of their crimes violated the Eighth and Fourteenth Amendments. The Court expanded its traditional "death is different" analysis and determined that juveniles are also different and, therefore, "cannot with reliability be classified among the worst offenders." *Id*. at 569. The Court identified three specific factors that made juveniles distinct: (1) juveniles generally lack maturity and have an underdeveloped sense of responsibility, which often leads to "impetuous and ill-considered actions and decisions"; (2) "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure"; and (3) "the character of a juvenile is not as well formed as that of an adult," and "[t]he personality traits of juveniles are more transitory, less fixed." *Id*. Based upon all of these factors, the Court reasoned that juveniles, as a class, had a greater capacity for reform than adults and, correspondingly, a lessened culpability; accordingly, the Eighth and Fourteenth Amendments precluded the State from "extinguish[ing] [a juvenile offender's] life and his potential to attain a mature understanding of his own humanity." *Id*. at 574.

In 2010, the Court decided the second in the series: *Graham v. Florida*, 560 U.S. 48 (2010), which held that the Eighth Amendment prohibits sentencing juvenile offenders to life without parole (LWOP) for nonhomicide offenses. The Court relied on its analysis in *Roper*

determining that juveniles are different, analogized an LWOP sentence to the death penalty, and recognized that the death penalty is not permitted for nonhomicide offenses. *Id*. at 68-75. The Court held that, while "[a] State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime[,] . . . [it must] give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id*. at 75.

Following *Graham*, the Court issued its third in the series of juvenile-related sentencing decisions: *Miller v. Alabama*, 132 S.Ct. 2455 (2012), which held that mandatory LWOP sentences imposed upon juvenile homicide offenders violated the Eighth and Fourteenth Amendments. The Court first recognized the determination in *Roper* and *Graham* "that children are constitutionally different from adults for purposes of sentencing." *Id*. at 2464. The Court then noted that, while "*Graham*'s flat ban on [LWOP] applied only to nonhomicide crimes, . . . none of what it said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific." *Id*. at 2465. Thus, the Court posited, "*Graham*'s reasoning implicates any [LWOP] sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses." *Id*. The Court then discussed the nature of mandatory penalties, noting that they, "by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it." *Id*. at 2467. The Court criticized mandatory sentencing schemes for treating every juvenile the same, despite varying degrees of culpability, such as those between "the 17-year-old and the 14-year-old, the shooter and the accomplice, the child from a stable household and the child from a chaotic and abusive one." *Id*. at 2467-68. Accordingly, the Court held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of

5

parole for juvenile offenders." *Id*. at 2469. The Court noted, "Although we do not foreclose a sentencer's ability to make th[e] judgment [that a juvenile offender deserves an LWOP sentence] in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id*.

In 2012, four months after the decision in *Miller* was handed down, Willbanks filed a petition for a writ of habeas corpus with the Missouri Supreme Court; the petition was denied without prejudice. In 2013, he filed a petition for a writ of habeas corpus with the Cole County Circuit Court, arguing that, because of the mandatory minimum sentencing requirements preceding parole eligibility, he was subject to a de facto LWOP sentence, which was precluded by the holding in *Graham*. The circuit court denied Willbanks's petition, indicating that his proper avenue for seeking relief was through a petition for declaratory judgment.

Accordingly, in April 2014, Willbanks filed a petition for declaratory judgment, imploring the court "to enter a judgment declaring that Missouri State Statutes and Regulations which require offenders to serve specific percentages of their sentences before they become eligible for parole are unconstitutional as applied to juvenile offenders, such as Mr. Willbanks," because they violated *Graham*'s mandate that juvenile offenders be given "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." The circuit court granted DOC's motion for judgment on the pleadings, finding *Graham* inapplicable to Willbanks's multiple, consecutive, parole-eligible, non-LWOP sentences. Willbanks appeals.

## Analysis

Willbanks raises a single claim on appeal. He argues that the court below erred in granting judgment on the pleadings because the holding in *Graham* applies to de facto life sentences, such as his, where his parole-eligibility date exceeds his life expectancy.

**A. Jurisdiction**

Willbanks's point on appeal states:

The trial court clearly erred in granting [DOC]'s Motion for Judgment on the Pleadings, because Willbanks was entitled to a declaration that **Missouri Statutes and Regulations requiring offenders to serve specific percentages of their sentence before becoming parole eligible are unconstitutional as applied to juveniles like Willbanks was when he committed the crimes**, because such application violates Willbanks'[s] constitutional rights to protection against cruel and unusual punishment as guaranteed by the 8th and 14th Amendments to the United States Constitution, and Article I, § 21 of the Missouri Constitution, in that his 385-year sentence constituted a de facto life sentence since under Missouri Statutes and Regulations he will be ineligible for parole until about age eighty-five no matter how much he has matured and rehabilitated, which is well-beyond his life expectancy, and thus he will not receive a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation, which is required by *Graham v. Florida* and the Eighth Amendment.

(Emphasis added.) The bolded portion of Willbanks's claim leads us to question our jurisdiction over this matter.

Article V, § 3, of the Missouri Constitution vests exclusive appellate jurisdiction with the Missouri Supreme Court "in all cases involving the validity . . . of a statute or provision of the constitution of this state." Here, Willbanks appears to challenge the constitutionality of both statutes and regulations. The Supreme Court has held that its exclusive jurisdiction over the validity of statutes does not extend to constitutional challenges to administrative regulations. *Adams Ford Belton, Inc. v. Mo. Motor Vehicle Comm'n*, 946 S.W.2d 199, 201 (Mo. banc 1997). Nevertheless, even if only "one of the issues involves the validity of a statute, th[e Supreme] Court has jurisdiction of the entire case." *Lester v. Sayles*, 850 S.W.2d 858, 861 (Mo. banc 1993). Thus, when a party raises a constitutional challenge to the validity of a statute, the court of appeals generally lacks jurisdiction to decide the case and must transfer the matter to the Supreme Court.

7

There are, however, two exceptions to the Supreme Court's exclusive jurisdiction: (1) if the constitutional claim is not properly preserved for review; or (2) if the claim is merely colorable as opposed to real and substantial. *See State v. Bowens*, 964 S.W.2d 232, 236 (Mo. App. E.D. 1998) (because constitutional claims are waived if not presented at the first opportunity, a party's failure to preserve a constitutional challenge takes that issue out of the case, leaving only matters that are not reserved for the exclusive jurisdiction of the Missouri Supreme Court); *Tadrus v. Mo. Bd. of Pharmacy*, 849 S.W.2d 222, 225 (Mo. App. W.D. 1993) (if a constitutional challenge is "merely colorable," jurisdiction remains in the court of appeals).

Here, though both parties advise that jurisdiction is proper in the court of appeals, "'appellate jurisdiction cannot be conferred by waiver, acquiescence, or even express consent.'" *Boone v. Boone*, 438 S.W.3d 494, 497 (Mo. App. W.D. 2014) (quoting *Ruestman v. Ruestman*, 111 S.W.3d 464, 477 (Mo. App. S.D. 2003)). Thus, we must examine the two exceptions to the Supreme Court's exclusive jurisdiction to discern whether we may decide this case.

### 1. Preservation

"To properly preserve a constitutional issue for appellate review, the issue must be raised at the earliest opportunity and preserved at each step of the judicial process." *Sharp v. Curators of Univ. of Mo.*, 138 S.W.3d 735, 738 (Mo. App. E.D. 2003). "Further, 'in order for the issue of the constitutional validity of a statute to be preserved for appellate review, the issue must not only have been presented to the trial court, but the trial court must have ruled thereon.'" *Id.* (quoting *Estate of McCluney*, 871 S.W.2d 657, 659 (Mo. App. W.D. 1994)). "And, the point raised on appeal must be based upon the theory advanced at the trial court." *Id.*

As presented to us, Willbanks has fully preserved his constitutional challenge to the validity of a Missouri statute. In his declaratory judgment petition, Willbanks argued that the

mandatory minimum prison terms required by § 558.019[2] were unconstitutional, as applied to him, under the holding in *Graham*. This is the same theory he presents to us now, and it is the same theory that was ruled on and rejected by the trial court. Thus, his constitutional challenge to § 558.019, as raised in his declaratory judgment action, is preserved.[3]

### 2. Willbanks's claim is not real and substantial.

To begin, "'[t]he simple fact that a constitutional right has been denied does not take a case out of the jurisdiction of our courts of appeals. The construction of the Constitution must be involved. The denial of such a right is error, to be sure, but the language of the Constitution is plain, and mere error, however, grave, does not vest jurisdiction in th[e Missouri Supreme C]ourt.'" *Knight v. Calvert Fire Ins. Co.*, 260 S.W.2d 673, 675 (Mo. 1953) (quoting *Wolf v. Hartford Fire Ins. Co.*, 263 S.W. 846, 847 (Mo. banc 1924)); *accord McNeal v. McNeal-Sydnor*, SC 94435, 2015 WL 5239878, at *1 (Mo. banc Sept. 8, 2015) ("This Court's exclusive appellate jurisdiction is not invoked simply because a case involves a constitutional issue.").

"The grant of authority to [the Missouri Supreme] Court to exercise exclusive appellate jurisdiction over questions involving the validity of a statute or constitutional provision is limited to claims that the state law *directly* violates the constitution—either facially or as applied." *Alumax Foils, Inc. v. City of St. Louis*, 939 S.W.2d 907, 912 (Mo. banc 1997). "'To present a constitutional question for review on the ground that a statute is unconstitutional, the constitutionality of the statute must be directly challenged. To say that a statute would be unconstitutional *if construed in a certain manner* does not meet the requirement.'" *Knight*, 260 S.W.2d at 675 (quoting *Phillips Pipe Line Co. v. Brandstetter*, 254 S.W.2d 636, 637 (Mo. 1953))

---

[2] All statutory references are to the Revised Statutes of Missouri 2000, unless otherwise noted.
[3] For purposes of a habeas corpus writ petition, preservation would not be an issue with this court, as the matter is considered for the first time by the court wherein the petition is filed. In the habeas context, the concern would be whether the claim was procedurally defaulted.

(emphasis added). In other words, conditional challenges to the constitutionality of a statute do not invoke the Missouri Supreme Court's exclusive jurisdiction. *See Whitaker v. City of Springfield*, 889 S.W.2d 869, 875 (Mo. App. S.D. 1994) (rejecting suggestion that constitutional challenge came within the Supreme Court's exclusive jurisdiction because the challenge "would have been conditional depending upon the manner in which the statute was construed"); *see also Forbis v. Assoc. Wholesale Grocers, Inc.*, 513 S.W.2d 760, 767 (Mo. App. 1974) ("an unconditional challenge is required since a contention that a statute would do violence to a constitutional proviso only if [the statute were] construed in a certain way does not raise a constitutional issue"), *overruled on other grounds by Lewis v. Wahl*, 842 S.W.2d 82, 84 (Mo. banc 1992).

"[T]he allegation concerning the constitutional validity of the statute must be real and substantial for jurisdiction to vest in the Supreme Court." *Sharp*, 138 S.W.3d at 738.

> A claim is substantial when "upon preliminary inquiry, the contention discloses a contested matter of right, involving some fair doubt and reasonable room for controversy; but, if such preliminary inquiry discloses the contention is so obviously unsubstantial and insufficient, either in fact or law, as to be plainly without merit and a mere pretense, the claim may be deemed merely colorable."

*Id*. (quoting *Estate of Potashnick*, 841 S.W.2d 714, 718 (Mo. App. E.D. 1992)). "'One clear indication that a constitutional challenge is real and substantial and made in good faith is that the challenge is one of first impression . . . .'" *Id*. (quoting *Rodriguez v. Suzuki Motor Corp.*, 996 S.W.2d 47, 52 (Mo. banc 1999)).

Willbanks argues that, because the mandatory minimum prison term he must serve, under his particular sentence, before being eligible for parole exceeds his life expectancy, he has received a de facto LWOP sentence for nonhomicide offenses. And, because he was a juvenile

10

at the time of his crimes, he argues that, under *Graham*, his sentence is a violation of the Eighth Amendment.

We have found only one Missouri case addressing a similar issue, but it concluded that *Graham* did not apply to a lengthy, but non-LWOP, term-of-years sentence. *State v. Denzmore*, 436 S.W.3d 635 (Mo. App. E.D. 2014). In *Denzmore*, the defendant raised a claim of plain error, arguing that his forty-four-year sentence violated the Eighth Amendment insofar as it constituted a de facto life sentence for a nonhomicide offense because it exceeded his life expectancy. *Id*. at 643-45. Though the Eastern District discussed *Graham* in rejecting the defendant's claim, because his claim involved only a single sentence, there was no discussion of the defendant's parole eligibility date or the cumulative effect of mandatory minimum prison terms on the defendant's claimed de facto life sentence. Rather, the court simply concluded that *Graham* was inapplicable because "the trial court sentenced Defendant to a term-of-years sentence [and] not life without parole." *Id*. at 645. Though Willbanks's claim involves multiple sentences imposed for multiple convictions, *Denzmore* is nevertheless instructive and suggests that the question raised in this appeal is not an issue of first impression.

Willbanks's claim is not real and substantial because his basic constitutional challenges are already well settled. To begin, there is nothing inherently unconstitutional about mandatory minimum time requirements preceding parole eligibility. *See State v. Pribble*, 285 S.W.3d 310, 314 (Mo. banc 2009) (finding no merit in claim that mandatory minimum of five years before parole eligibility on the crime of enticement of a child constituted cruel and unusual punishment); *see also Harmelin v. Michigan*, 501 U.S. 957, 995 (1991) ("There can be no serious contention . . . that a sentence which is not otherwise cruel and unusual becomes so simply because it is 'mandatory.'"). Nor is there anything patently unconstitutional in the fact

11

that multiple sentences are run consecutively. *State v. Neal*, 514 S.W.2d 544, 549 (Mo. banc 1974) ("where a defendant is convicted of separate offenses and the sentences imposed are within statutory limits, as in this case, [the] consecutive effect of such sentences does not constitute cruel and unusual punishment"), *abrogated on other grounds by State v. McTush*, 827 S.W.2d 184 (Mo. banc 1992). Finally, there is no constitutional violation simply because multiple consecutive sentences result in a sentence longer than a person's life expectancy. *See, e.g., State v. Wallace*, 745 S.W.2d 233 (Mo. App. E.D. 1987) (holding that consecutive sentences totaling life plus 190 years did not constitute cruel and unusual punishment).

Thus, the only way Willbanks's challenge can be successfully levied is if the holding in *Graham* applies to multiple, consecutive, non-LWOP sentences whose cumulative effect is a parole eligibility date outside of Willbanks's life expectancy. But the question of whether *Graham* applies to Willbanks's sentence does not present a constitutional challenge. *See, e.g., Goins v. Smith*, 2012 WL 3023306, *7 (N.D. Ohio July 24, 2012) ("Without the ability to rely on *Graham*, Goins's Eighth Amendment claim evaporates."), *aff'd*, 556 Fed. Appx. 434 (6th Cir. 2014), *cert. denied*, *sub nom Goins v. Lazaroff*, 135 S.Ct. 144 (Oct. 6, 2014). In other words, Willbanks's challenge to the constitutionality of the statutes and regulations at issue is conditional upon a *non-constitutional* determination that *Graham* applies to sentences like his. Accordingly, because his constitutional challenge is conditional, it is therefore not real and substantial such that it falls within the exclusive jurisdiction of the Missouri Supreme Court. *See State v. Perdomo-Paz*, 2015 WL 4240751, *8 n.3 (Mo. App. W.D. July 14, 2015) (holding that the appellant's challenge to the constitutionality of § 565.020 was not real and substantial where the appellant was seeking to expand *Miller*'s holding to cover 18-year-old offenders). Accordingly, we have jurisdiction to decide Willbanks's claim.

**B. Willbanks's claim should have been brought in a petition for a writ of habeas corpus.**

Though this case comes to us as an appeal from the denial of a petition for a declaratory judgment, we believe it is better suited for a habeas action.

"Under § 527.010 of the Declaratory Judgment Act, circuit courts have the 'power to declare rights, status, and other legal relations whether or not further relief is or could be claimed.'" *Shelter Mut. Ins. Co. v. Vulgamott*, 96 S.W.3d 96, 101 (Mo. App. W.D. 2003) (quoting *People ex rel. Small v. Harrah's N. Kansas City Corp.*, 24 S.W.3d 60, 64 (Mo. App. W.D. 2000)). The Declaratory Judgment Act "specifically provides that declaratory judgments are a proper vehicle for testing the validity of statutes or ordinances." *Northgate Apartments, L.P. v. City of North Kansas City*, 45 S.W.3d 475, 479 (Mo. App. W.D. 2001) (citing § 527.020).[4]

> Nonetheless, in order to maintain a declaratory judgment action, a petitioner must satisfy four requirements. First, the petitioner must demonstrate a justiciable controversy exists which presents a real, substantial, presently-existing controversy as to which specific relief is sought, as distinguished from an advisory decree offered upon a purely hypothetical situation. Second, the petitioner must demonstrate a legally protected interest consisting of a pecuniary or personal interest directly at issue and subject to immediate or prospective consequential relief. Third, the question presented by the petition must be ripe for judicial determination. A petitioner who satisfies all three of these elements must also demonstrate that he or she does not have an adequate remedy at law.

*Charron v. State*, 257 S.W.3d 147, 151-52 (Mo. App. W.D. 2008) (quoting *Northgate Apartments*, 45 S.W.3d at 479).

Willbanks's petition sought a declaration that Missouri's mandatory minimum percentages for service of prison terms before parole eligibility, as provided through both statute

---

[4] Section 527.020, provides, in pertinent part: "Any person . . . whose rights, status or other legal relations are affected by a statute, [or] municipal ordinance . . . may have determined any question of construction or validity arising under the . . . statute, [or] ordinance . . . and obtain a declaration of rights, status or other legal relations thereunder."

and regulation, are unconstitutional as applied to those who were juveniles at the time of the underlying offense(s). This matter was initially (and properly) pursued in a petition for writ of habeas corpus, but at the suggestion of DOC and judgment of the Cole County Circuit Court, Willbanks abandoned his pursuit of a habeas writ in favor of seeking a declaratory judgment. The rationale for that decision appears to have been in accordance with DOC's assertion that Willbanks is neither challenging his specific sentence nor seeking immediate release; thus, the matter is not appropriate for a writ of habeas corpus. This Court's prior holding in *Charron*, however, refutes DOC's contention.

"The Declaratory Judgment Act 'is neither a general panacea for all legal ills nor a substitute for existing remedies. It is not to be invoked where an adequate remedy already exists.'" *Charron*, 257 S.W.3d at 153 (quoting *Cooper v. State*, 818 S.W.2d 653, 654 (Mo. App. W.D. 1991)). "The post-conviction rules provide the exclusive remedy for challenges to the validity of a sentence or conviction on grounds of violation of state statute or the federal or state constitutions." *Id*. "If an inmate fails to file a timely motion for post-conviction relief, he 'may merit habeas relief by demonstrating cause for the failure to timely raise the claim at an earlier juncture and prejudice resulting from the error that forms the basis of the claim.'" *Id*. (quoting *State ex rel. Taylor v. Moore*, 136 S.W.3d 799, 801 (Mo. banc 2004)). "Thus, at the very least, a declaratory judgment action is improper to challenge the validity of a sentence or conviction where any of these avenues is available." *Id*.

In *Charron*, the appellant claimed "that he asked the trial court to address 'enforcement of the prison term imposed' and to declare that the sentences are not 'authorized by law,' or not enforceable." *Id*. This Court held that those challenges were "clearly an attack on the 'validity of his sentence,' which [wa]s inappropriate for a declaratory judgment action." *Id*. In rejecting

the appellant's claim that he was not attacking the validity of his sentence, the court relied on the dictionary definition of "valid," which was "as, among other things, 'authorized by law' or 'incapable of being rightfully overthrown or set aside.'" *Id.* at 153 n.5 (quoting BLACK'S LAW DICTIONARY 1550 (6th ed. 1990)).

Here, Willbanks alleged that his sentences are the functional equivalent of life without parole because *his* parole eligibility date exceeds *his* life expectancy, and therefore the aggregate term of imprisonment constitutes cruel and unusual punishment, as determined by the United States Supreme Court in *Graham*. In other words, Willbanks alleged that *his particular sentence* is unconstitutional and, therefore, invalid. This is a claim falling within the post-conviction rules.

Though DOC is correct that Willbanks has not asked for either his sentence to be vacated or resentencing, the same was true in *Charron*. There, the appellant argued that he was not levying an attack on his particular sentence because "he d[id] not request that any of the sentences be vacated or set aside," which he argued rendered "his claims appropriate for a declaratory judgment action." *Id.* at 153, 154. This Court rejected that argument, noting that the appellant "cite[d] no authority for this contention, and we found none in our independent research." *Id.* at 154. Furthermore, this Court noted that "there is no indication in the record that Appellant (or any of the other allegedly similarly situated inmates) has been foreclosed from the other avenues for challenging the validity of his sentences, and Appellant does not make this argument." *Id.*

Accordingly, it appears that Willbanks's claims were improperly brought under the Declaratory Judgment Act. Normally, that would be an alternative basis for this Court to affirm the lower court's dismissal. *State ex rel. Feltz v. Bob Sight Ford, Inc.*, 341 S.W.3d 863, 868 n.3

15

(Mo. App. W.D. 2011) (appellate courts are concerned with the correctness of the lower court's result rather than its rationale and will affirm under any available theory). But Willbanks's choice to pursue a declaratory judgment, rather than a habeas writ, was based—at least in part—on DOC's suggestion, adopted by the trial court, that his claims were more suitable for a declaratory judgment petition. Thus, it seems unjust to affirm the dismissal below where the error was brought about by Willbanks's efforts to comply with DOC's assertions.

"[I]n limited circumstances, th[e appellate c]ourt will treat improper appeals as applications for original writs, if writ is available to a movant." *State v. Larson*, 79 S.W.3d 891, 893 (Mo. banc 2002); *see also In re N.D.C.*, 229 S.W.3d 602, 604 (Mo. banc 2007) (same). Before we may consider doing so, however, we must determine whether a writ is available to Willbanks. Though Willbanks previously filed writ petitions in both Cole County Circuit Court and the Missouri Supreme Court, he has never filed such a petition with this court. Though "[s]uccessive *habeas corpus* petitions are, as such, not barred[,] . . . the opportunities for such relief are extremely limited." *State ex rel. Nixon v. Jaynes*, 63 S.W.3d 210, 217 (Mo. banc 2001).

The prior filings do not bar our consideration. Though we recognize that Rule 91.22 provides that "[w]hen a petition for a writ of habeas corpus has been denied by a higher court, a lower court shall not issue the writ," the rule does not apply where "the order in the higher court denying the writ is without prejudice to proceeding in a lower court." The Missouri Supreme Court's denial of Willbanks's habeas petition was specifically "without prejudice."[5] Accordingly, we are not barred by Rule 91.22 from treating this appeal as an original writ petition.

---

[5] Though the Court's order specifically stated, "without prejudice," we do not rely upon that language, as the denial would have been assumed to have been without prejudice, absent language to the contrary. *McKim v. Cassady*, 457 S.W.3d 831, 839 (Mo. App. W.D. 2015).

16

Further, Willbanks was not required to appeal the denial of his writ petition in Cole County Circuit Court. *Ferguson v. Dormire*, 413 S.W.3d 40, 50-51 (Mo. App. W.D. 2013). Rather, "[a] petitioner's remedy where a petition for writ of habeas corpus is denied is to file a new writ petition in a higher court." *Garner v. Roper*, 224 S.W.3d 623, 623 n.1 (Mo. App. E.D. 2007). Accordingly, Willbanks's prior writ petitions do not bar us from treating this appeal as an original petition for writ of habeas corpus.

The next question is whether, and under what circumstances, we should treat an appeal as an original writ petition.

> Cases should be heard on the merits if possible, construing the court rules liberally to allow an appeal to proceed. While not condoning noncompliance with the rules, a court will generally, as a matter of discretion, review on the merits where disposition is not hampered by the rule violations.

*Larson*, 79 S.W.3d at 894 (quoting *Brown v. Hamid*, 856 S.W.2d 51, 53 (Mo. banc 1993)). We will treat an appeal as an original petition for writ of habeas corpus if doing so is "'[i]n the interest of avoiding delay and further duplication of effort which would be involved in dismissing this appeal and then having a new proceeding started by the filing of a new application for writ of habeas corpus in this court,'" *id*. at 893 n.8 (quoting *Jones v. State*, 471 S.W.2d 166, 169 (Mo. banc 1971)), and the relevant issues are sufficiently delineated in the briefs to permit us to decide them. *Brown*, 856 S.W.2d at 53.

Here, the parties have provided sufficient record and briefing on issues pertaining to the propriety of considering a habeas corpus writ petition, and a dismissal here would simply create unnecessary delay and duplication of effort. Thus, we will treat this appeal as an original petition for a writ of habeas corpus.

17

**C. Willbanks's claim falls within the sentencing-defect exception, permitting habeas review.**

"Relief in habeas corpus is available 'when a person is held in detention in violation of the constitution or laws of the state or federal government.'" *State ex rel. Zinna v. Steele*, 301 S.W.3d 510, 516 (Mo. banc 2010) (quoting *Jaynes*, 63 S.W.3d at 214). "[I]f a petitioner fails to raise a claim for relief that could have been asserted in an appeal or in a post-conviction motion, the petitioner normally is barred from raising the claim in a subsequent petition for writ of habeas corpus." *Id*. Willbanks concedes that he did not raise any challenges to the mandatory minimum terms he would have to serve before being parole eligible either on direct appeal or in a post-conviction motion.

"In limited circumstances, however, the failure to timely raise a claim under Rule 24.035 or Rule 29.15 does not bar subsequent habeas relief." *Id*.

> This occurs when the petitioner can demonstrate: "(1) a claim of actual innocence or (2) a jurisdictional defect[6] or (3)(a) that the procedural defect was caused by something external to the defense—that is, a cause for which the defense is not responsible—and (b) prejudice resulted from the underlying error that worked to the petitioner's actual and substantial disadvantage."

*Id*. at 516-17 (quoting *Brown v. State*, 66 S.W.3d 721, 731 (Mo. banc 2002)). "Cases in which a person received a sentence greater than that permitted by law traditionally have been analyzed under the second of these exceptions." *Id*. at 517. And "where a court 'imposes a sentence that is in excess of that authorized by law, habeas corpus is a proper remedy.'" *Id*. (quoting *State ex rel. Osowski v. Purkett*, 908 S.W.2d 690, 691 (Mo. banc 1995)).

Willbanks argues that his sentence violates the Eighth Amendment, as construed by the Supreme Court in *Graham*. DOC claims that this challenge does not fall within the sentencing-defect exception because Willbanks does not allege that the sentence was in violation

---

[6] The Court, in *State ex rel. Zinna v. Steele*, 301 S.W.3d 510, 516 (Mo. banc 2010), clarified that this exception is no longer properly considered a "jurisdictional" defect; rather, it is merely a sentencing defect.

18

of a *statute*, which it claims is the only basis for applying the sentencing-defect exception. We find this argument to be without merit.

In *State v. Whitfield*, 107 S.W.3d 253, 269 n.19 (Mo. banc 2003), the Court held that habeas relief would be appropriate under a sentencing-defect theory where the defendant, though sentenced in compliance with Missouri statute, was sentenced in violation of the Eighth Amendment, as interpreted in *Ring v. Arizona*, 536 U.S. 584 (2002), which was handed down after the defendant's direct and post-conviction appeals were final. The same is true here. Willbanks's sentences comply with Missouri statutes, but he claims that they are in violation of the Eighth Amendment, as interpreted by *Graham*. This argument falls within the sentencing-defect exception and permits us to review the merits of his claim.

**D. *Graham* does not apply to Willbanks's sentence.**

*Graham* held that LWOP sentences violate the Eighth Amendment when imposed upon juvenile, nonhomicide offenders. *Graham*, 560 U.S. at 74. Thus, for *Graham* to apply to Willbanks's sentences, he must establish: (1) that he was a juvenile at the time he committed the crimes; (2) that he was convicted of solely nonhomicide offenses;[7] and (3) that he received a sentence of life without the possibility of parole.

There is no quarrel about whether Willbanks was a juvenile at the time of his crimes; he was born on October 29, 1981, and the crimes were committed on January 28, 1999. Thus, at the time, Willbanks was seventeen years old.

Whether Willbanks was convicted of solely nonhomicide offenses poses a more interesting question. One of Willbanks's convictions was for first-degree assault. In Missouri,

---

[7] The Court in *Graham* noted that its holding "concern[ed] only those juvenile offenders sentenced to life without parole solely for a nonhomicide offense" because "[j]uvenile offenders who committed both homicide and nonhomicide crimes present a different situation for a sentencing judge than juvenile offenders who committed no homicide." *Graham*, 560 U.S. at 63.

19

first-degree assault is defined as an "*attempt[] to kill* or knowingly cause[] or attempt[] to cause serious physical injury to another person." § 565.050.1 (emphasis added).

"The *Graham* opinion failed to clarify where attempted murder falls along the homicide/nonhomicide divide." Craig S. Lerner, *Juvenile Criminal Responsibility: Can Malice Supply the Want of Years?*, 86 TUL. L. REV. 309, 376 (2011). There is language in the opinion supporting both views. *Id*.

> On the one hand, some language points to the consequence (death) as decisive. The astute observation that "'[l]ife is over for the victim of the murderer,'" which the Court contrasts with the victim of "even a very serious nonhomicide crime," would seem to categorize "attempted murder," whose victim, of course, survives, as a nonhomicide. Other language, however, focuses on the intentions of the offender and appears to include those who actually kill someone with those who intended to kill, grouping these offenders together as "categorically . . . deserving of the most serious forms of punishment." The latter view is perhaps more strongly supported in the text, as in the blanket statement, "It follows that, when compared to an adult murderer, a juvenile offender who did not kill *or intend to kill* has a twice diminished moral culpability."

*Id*. (quoting *Graham*, 560 U.S. at 69) (emphasis added) (footnotes omitted); *see also* Scott R. Hechinger, *Juvenile Life Without Parole: An Antidote to Congress's One-Way Criminal Law Ratchet?*, 35 N.Y.U. REV. L. & SOC. CHANGE 408, 424-25 (2011) ("the definition of what qualifies as a nonhomicide offense is not yet clear").

Though many courts addressing the question believe that assault with intent to kill (or the similar crime of attempted murder) is a nonhomicide offense under *Graham* because there is no death involved, there are others suggesting otherwise and evaluating claims like Willbanks's under *Miller*, which bars mandatory LWOP sentences for juvenile *homicide* offenders.[8]

---

[8] In *State v. Nathan*, 404 S.W.3d 253, 256 (Mo. banc 2013), addressing a claim arising under *Miller v. Alabama*, 132 S.Ct. 2455 (2012), the Missouri Supreme Court referred to first-degree assault as a "non-homicide crime[]." The Court, however, was distinguishing the assault charge (and other felonies) from the defendant's additional first-degree murder charge; thus, though suggestive, we do not believe this is a clear statement from the Missouri Supreme Court that first-degree assault (charged as attempt to kill) would be a nonhomicide offense for purposes of *Graham*.

*Compare, e.g., Bramlett v. Hobbs*, 463 S.W.3d 283, 286-87 (Ark. 2015) (attempted capital murder is a nonhomicide offense under *Graham*); *Gridine v. State*, 2015 WL 1239504, *2-3 (Fla. Mar. 19, 2015) (attempted first-degree murder is a nonhomicide offense under *Graham*); *with Twyman v. State*, 2011 WL 3078822, *1 (Del. July 25, 2011) ("under *Graham*, Attempted Murder in the First Degree appears to fall within the category of crimes for which a life sentence without parole may be imposed upon a juvenile," i.e., a homicide offense); *see also People v. Gipson*, 34 N.E. 3d 560, 576 (Ill. App. Ct. 2015) ("We find it unclear whether attempted murder is governed by the holding of *Graham* or the holding of *Miller* . . . ."; "In the context of the eighth amendment, we seriously question whether attempted murder constitutes a nonhomicide offense."); *Cervantes v. Biter*, 2014 WL 2586884, *4-5 (C.D. Cal. Feb. 7, 2014) (noting that though "neither *Graham* nor *Miller* addressed the issue, . . . there is good reason to believe that the United States Supreme Court, if it were to address the issue, would conclude that attempted murder is a homicide offense" (citing *Graham*)); *People v. Rainer*, 2014 WL 7330977, *1 (Colo. Dec. 22, 2014) (in granting petition for writ of certiorari, framing issue as: "Whether a conviction for attempted murder is a non-homicide offense within the meaning of *Graham v. Florida*, 560 U.S. 48 (2010).").

This distinction could be vital to Willbanks's claim, for if first-degree assault constitutes a homicide offense, then, under *Miller*, an LWOP sentence (assuming Willbanks's consecutive term-of-years sentences are equivalent to a single LWOP sentence) was an available option to the court, so long as the court considered Willbanks's youth as a mitigating factor. *Miller*, 132 S.Ct. at 2475. *Graham*, on the other hand, forbids a court from making a determination *at the outset* that a juvenile nonhomicide offender is incorrigible; thus, imposing an LWOP sentence is

21

problematic, even if it was discretionary and the court considered Willbanks's youth a mitigating factor. *Graham*, 560 U.S. at 72-73.

The question related to the homicide/nonhomicide distinction, however, is somewhat pedantic here—and one we need not answer—because Willbanks's seven consecutive term-of-years sentences are not the same as a single LWOP sentence.

Willbanks received seven distinct sentences for seven different convictions. None of his sentences were life imprisonment without parole, and none of them—standing in isolation— come even close to imprisoning Willbanks for his natural lifetime without the possibility of parole. Willbanks's longest sentence was, in fact, life *with* the possibility of parole. And each of his remaining sentences contains the possibility of parole at some point before the full sentence is served.[9] Thus, even though Willbanks was a juvenile at the time of his offenses, and even though his offenses could all be considered to be nonhomicide offenses, he fails to come within the holding of *Graham* for the same reason as the defendant in *Denzmore*—because "the trial court sentenced Defendant to a term-of-years sentence [and] not life without parole." *Denzmore*, 436 S.W.3d at 645.

**E. *Graham* should not be extended to aggregate sentences like Willbanks's.**

Having determined that *Graham* does not apply to Willbanks's sentences, we turn now to the question of whether *Graham*'s holding should be extended to include aggregate sentences like Willbanks's, which he characterizes as a de facto LWOP sentence.

The parties agree that the cumulative effect of § 558.018.3 and 14 C.S.R. § 80-2.010 on Willbanks's seven consecutive sentences is that Willbanks will not be parole eligible until he is close to 85 years old. Willbanks argues that, because actuarial statistics suggest that he cannot

---

[9] *Graham*'s mandate requires a "realistic opportunity to obtain release before the end of th[e] term." *Graham*, 560 U.S. at 82.

expect to live past age 79.5, he has effectively received an LWOP sentence, given that he is not parole eligible within his natural lifetime. He then relies on the holding in *Graham* that the Eighth Amendment "forbid[s] States from making the judgment at the outset that [juvenile nonhomicide] offenders never will be fit to reenter society," and, accordingly, "the State must . . . give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 75.

This holding, however, begs the question of whether Willbanks is a "defendant[] like Graham," and thus entitled to the same constitutional protections. Though he is certainly like Graham insofar as he was a juvenile at the time he committed his offenses, and he is like Graham insofar as his offenses were arguably nonhomicide offenses, we think he is unlike Graham in the fact that he received multiple sentences for multiple offenses, none of which were LWOP. And this distinction is one that counters against expanding *Graham*'s holding.

**1. Willbanks has failed to properly support his independent categorical challenge.**

*Graham* involved "a categorical challenge to a term-of-years sentence"—"an issue the [Supreme] Court ha[d] not considered previously." *Id*. at 61. Like Graham, Willbanks raises his claim as a categorical challenge. Under the categorical approach to analyzing the claimed Eighth Amendment violations, *Graham* first examined whether there were "objective indicia of national consensus" against imposing LWOP sentences on juvenile nonhomicide offenders. *Id*. at 62. The Court concluded that "in proportion to the opportunities for its imposition, life without parole sentences for juveniles convicted of nonhomicide crimes is as rare as other sentencing practices found to be cruel and unusual." *Id*. at 66.

The Court then applied its independent judgment to consider "the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the

punishment in question." *Id*. at 67. The Court determined that, in accordance with its holding in *Roper*, juveniles, as a class, "have lessened culpability," and are therefore "less deserving of the most severe punishments." *Id*. at 68. The Court recognized, however, that "status of the offenders" was not the only relevant consideration; "it is [also] relevant to consider . . . the nature of the offenses to which this harsh penalty might apply." *Id*. at 68-69. After noting that "a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability," the Court evaluated "[t]he penological justifications for the sentencing practice" and concluded that "penological theory is not adequate to justify life without parole for juvenile nonhomicide offenders." *Id*. at 69, 71, 74.

Here, Willbanks argues that de facto LWOP sentences, like true LWOP sentences, should also be categorically banned for juvenile nonhomicide offenders. But unlike Graham, Willbanks has made no effort to demonstrate that there is any national consensus, whatsoever, against imposing de facto LWOP sentences against juvenile nonhomicide offenders. Though there are certainly some jurisdictions that agree with Willbanks's position,[10] they hardly evidence the kind

---

[10] *See, e.g., Henry v. State*, 2015 WL 1239696, *4 (Fla. Mar. 19, 2015) (holding that "*Graham* prohibits the state trial courts from sentencing juvenile nonhomicide offenders to prison terms that ensure these offenders will be imprisoned without obtaining a meaningful opportunity to obtain future early release during their natural lives based on their demonstrated maturity and rehabilitation"); *Bear Cloud v. State*, 334 P.3d 132, 142 (Wyo. Sept. 10, 2014) (quoting *Miller v. Alabama*, 132 S.Ct. 2455, 2458 (2012)) ("The juvenile who will likely die in prison is entitled to the Eighth Amendment's presumption 'that children are constitutionally different from adults for sentencing purposes,' and that they 'have diminished culpability and greater prospects for reform.'"); *State v. Pearson*, 836 N.W.2d 88, 96 (Iowa 2013) (holding that the Iowa constitution "requires an individualized sentencing hearing where, as here, a juvenile offender receives a minimum of thirty-five years imprisonment without the possibility of parole for these offenses and is effectively deprived of any chance of an earlier release and the possibility of leading a more normal adult life"); *People v. Caballero*, 282 P.3d 291, 295 (Cal. 2012) ("sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment"); *but see Bunch v. Smith*, 685 F.3d 546, 553 (6th Cir. 2012) (holding that *Graham* does not apply to "juvenile offenders . . . who received consecutive, fixed-term sentences for committing multiple nonhomicide offenses"), *cert. denied, sub nom. Bunch v. Bobby*, 133 S.Ct. 1996 (April 22, 2013); *State v. Brown*, 118 So.3d 332, 341 (La. 2013) ("In our view, *Graham* does not prohibit consecutive term of year sentences for multiple offenses committed while a defendant was under the age of 18, even if they might exceed a defendant's lifetime . . . ."); *State v. Kasic*, 265 P.3d 410, 415, 416 (Ariz. Ct. App. 2011) (distinguishing *Graham*: "Here, unlike Graham, who was sentenced to life without parole for one felony conviction, Kasic was convicted of thirty-two felonies involving multiple victims and the jury determined the majority of the offenses were of a dangerous nature"; and holding "that the Eighth

24

of "objective indicia of national consensus" traditionally used in the categorical approach to claimed violations of the Eighth Amendment. And, as Willbanks himself points out, many of those cases fail to identify any national consensus either. Thus, Willbanks has failed to properly assert a categorical challenge to de facto LWOP sentences for juvenile nonhomicide offenders.[11]

### 2. Even if viewed as a proper categorical challenge, it is simply unworkable.

Setting aside the formalities of a proper categorical challenge, the larger problem with Willbanks's claim is that his proposed categorical approach is unworkable for a variety of reasons, ranging from the inherent difficulty of defining a de facto LWOP sentence to the implicit conflict it creates with the dictates of *Miller* and the Eighth Amendment's bar on the arbitrary imposition of severe penalties.

At the outset, we find it difficult—at best—to define what constitutes a de facto LWOP sentence. Willbanks suggests that a de facto LWOP sentence exists in any situation where the offender's parole eligibility date lies beyond his life expectancy. But, as one court recognized, "applying the holdings of *Graham* and *Miller* to term-of-[years] sentences could create difficulty in the close cases such as when life expectancy and age at the time of release are nearly equal." *Boneshirt v. U.S.*, 2014 WL 6605613, *9 (D.S.D. Nov. 19, 2014). We find Willbanks's approach too simplistic because it fails to account for a variety of factors. For example, it does not take into consideration the age of the offender at sentencing, or what factors or sources are to be used in determining life expectancy.

The age of a juvenile offender at sentencing is often, though not always, that of a young adult. Section 556.036.1 provides that "A prosecution for murder, rape in the first degree,

---

Amendment does not prohibit Kasic's sentences for the crimes he committed as a juvenile"); *Middleton v. State*, 721 S.E.2d 111, 112-13 (Ga. Ct. App. 2011) (quoting *Adams v. State*, 707 S.E.2d 359 (Ga. 2011)) ("'nothing in [*Graham*] affects the imposition of a sentence to a term of years without the possibility of parole.'").

[11] This serves as yet another indication that Willbanks's claim is not real and substantial and, therefore, does not fall within the Missouri Supreme Court's exclusive jurisdiction.

forcible rape, attempted rape in the first degree, attempted forcible rape, sodomy in the first degree, forcible sodomy, attempted sodomy in the first degree, attempted forcible sodomy, or any class A felony may be commenced at any time." In some instances, a crime or crimes will go unsolved for a period of time and become cold cases, until a subsequent DNA hit is retrieved from CODIS,[12] identifying a potential perpetrator. In situations such as these, the offender may have been a juvenile at the time of the crime's commission, but could very well be middle-aged or older by the time of apprehension, trial, and sentencing. This could create a disparity wherein a particular sentence for a particular crime constitutes a de facto LWOP sentence for one juvenile offender but not for another.

For example, assume that two young men, both age 16, forcibly raped two separate women in unconnected crimes in 2011. The first young man is captured, tried, convicted, and sentenced by the end of 2014 when he is 19 years old. The second young man, however, evades detection for a number of years and ultimately is not tried, convicted, and sentenced until 2045 (when he is 50 years old) after being picked up for an unrelated crime and being matched to the victim of the 2011 rape through a DNA hit. Both men are sentenced to 30 years for their respective offenses. Because forcible rape is a dangerous felony, both are required by § 558.019.3 to serve a minimum of 25.5 years before becoming eligible for parole. This means that the first man was not only eligible for parole but also completed his sentence before the second man was ever discovered. But, if the second man's life expectancy is less than age 75.5, under Willbanks's theory, his 30-year sentence becomes a de facto LWOP sentence which would

---

[12] "CODIS is the acronym for the 'Combined DNA Index System' and is the generic term used to describe the FBI's program of support for criminal justice DNA databases as well as the software used to run these databases." FED. BUREAU OF INVESTIGATION, FREQUENTLY ASKED QUESTIONS (FAQS) ON THE CODIS PROGRAM AND THE NATIONAL DNA INDEX SYSTEM, https://www.fbi.gov/about-us/lab/biometric-analysis/codis/codis-and-ndis-fact-sheet (last visited Oct. 21, 2015).

be categorically barred because he was a juvenile at the time he committed the offense. This discrepancy is difficult to justify.

Furthermore, there are a number of variables that go into calculations of life expectancy, as well as a variety of sources used for the determination. Willbanks's approach fails to account for these variables or the potential disparate results from using actuarial data as the measuring stick.

"The issue of where to draw the line on when an individual's life will end presents a daunting and, more than likely, improbable task." Therese A. Savona, *The Growing Pains of Graham v. Florida: Deciphering Whether Lengthy Term-of-Years Sentences for Juvenile Defendants Can Equate to the Unconstitutional Sentence of Life Without the Possibility of Parole*, 25 ST. THOMAS L. REV. 182, 209 (Spring 2013). "It is impossible to determine precisely how long any one person has to live, but the question comes up regularly enough in several areas of law that government agencies have adopted standard actuarial tables for determining the life expectancy of a person." *Boneshirt*, 2014 WL 6605613 at *10.

> For determining the number of years left in a life annuity, the IRS expects an eighteen-year-old male to live nearly fifty-four more years to around age seventy-two. 26 C.F.R. § 1.72-9 at tbl.I. Another IRS table sets the life expectancy for an eighteen-year-old at another sixty-five years, living to be eighty-three. 26 C.F.R. § 1.401(a)(9)-9. The Social Security Administration has its own actuarial tables, which, in 2010 predicted that an eighteen-year-old male would live an average of another 58.9 years, to almost age seventy-seven. *Actuarial Life Table,* SSA, http:// www.ssa.gov/oact/STATS/table4c6.html# ss (last visited Oct. 31, 2014). And . . . the Sentencing Commission has apparently found federal inmates, at least those incarcerated at age thirty-six, to have a life expectancy of seventy-five years.

*Id*. Thus, according to Willbanks's argument, an offender's sentence may or may not be a de facto life sentence, depending upon which actuarial tables are used.

27

Countless factors affect life expectancy; for example, the National Longitudinal Mortality Study[13] considers the following factors, among others: geography, gender, age, birth information, race, ethnicity, marital status, household characteristics, education, socioeconomic status, and health. U.S. CENSUS BUREAU, *National Longitudinal Mortality Study Reference Manual* (July 1, 2014), https://www.census.gov/did/www/nlms/publications/reference.html. The NLMS, however, does not consider institutionalization, which has also been shown to be a factor affecting life expectancy. *People v. Sanders*, 2014 WL 7530330, *10-11 (Ill. App. Ct. Sept. 23, 2014). Many of these are "factors that sentencing courts are generally prohibited from taking into consideration."[14] Krisztina Schlessel, *Graham's Applicability to Term-of-Years Sentences and Mandate to Provide a "Meaningful Opportunity" for Release*, 40 FLA. ST. U. L. REV. 1027, 1056 (Summer 2013). "Indubitably, accounting for such factors would be impractical, if not impossible, for it would create a new line of problems and transform the life determination into a trial of its own." *Id*. And, because so many different factors affect life expectancy, it may very well be that the same sentence imposed on offenders of different races or genders could have different effects. In other words, while a 30-year sentence might constitute a de facto LWOP sentence for a black male, it may not be the same for a white female. Again, it is difficult to

---

[13] "The National Longitudinal Mortality Study (NLMS) consists of a database developed for the purpose of studying the effects of demographic and socio-economic characteristics on differentials in U.S. mortality rates. The NLMS is a unique research database in that it is based on a random sample of the non-institutionalized population of the United States." U.S. CENSUS BUREAU, NATIONAL LONGITUDINAL MORTALITY STUDY, *Description of Project*, https://www.census.gov/did/www/nlms/about/projectDescription.html (last visited Oct. 21, 2015).

[14] Proper sentencing considerations are "*the nature and circumstances of the offense* and *the history and character of the defendant*." § 557.036.1 (emphasis added). To afford these considerations any meaning, nearly every statutory crime in Missouri contains a range of punishment, within which the court may sentence the defendant. § 558.011.1. And with the exception of certain sexual offenses, § 558.026.1, the sentencing court also has the discretion to run multiple sentences concurrently or consecutively, again based upon the factors identified in § 557.036.1. And, since the Court's decisions in *Roper*, *Graham*, and *Miller*, determining that, for sentencing purposes, children are different, it is beyond dispute that one of the mitigating circumstances a court must now consider under § 557.036.1 is the offender's youth.

justify this disparity, especially given the fact that it would be imposed based, in part, upon protected and immutable characteristics.[15]

An additional problem arises from Willbanks's suggested categorical approach: it hamstrings Missouri's existing method of discretionary sentencing and creates an implicit conflict with the dictates of *Miller,* as well as the Eighth Amendment. Willbanks's approach fails to consider not only factors affecting the definition of a de facto LWOP sentence but also the relative culpability of the offender, such as the number of crimes at issue, whether the series of crimes occurred in a single event or over a period of time, the number of victims involved, and the offender's role in the crimes.

In *Miller*, the Court rejected the application of a mandatory LWOP sentence for juvenile homicide offenders expressly because it curtailed the discretion sentencers generally have to consider mitigating factors, such as youth, in deciding the sentence to impose. *Miller*, 132 S.Ct. at 2467-68. More specifically, the Court identified a veritable continuum of culpability that a sentencer is precluded from considering when bound by mandatory sentencing schemes:

> Such mandatory penalties, by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it. Under these schemes, every juvenile will receive the same sentence as every other—the 17-year-old and the 14-year-old, the shooter and the accomplice, the child from a stable household and the child from a chaotic and abusive one.

*Id*. Accordingly, the Court emphasized the need for discretion. And, as the Court has recognized, "Deeply ingrained in our legal tradition is the idea that the more purposeful is the

---

[15] Even some courts that support Willbanks's argument have refused to rely on actuarial data to do so. *See Bear Cloud*, 334 P.3d at 142 (quoting *State v. Null*, 836 N.W.2d 41, 71 (Iowa 2013)) ("Like the Iowa Supreme Court, 'we do not believe the determination of whether the principles of *Miller* or *Graham* apply in a given case should turn on the niceties of epidemiology, genetic analysis, or actuarial sciences in determining precise mortality dates.'").

criminal conduct, the more serious is the offense, and therefore, the more severely it ought to be punished." *Tison v. Arizona*, 481 U.S. 137, 156 (1987).

If de facto LWOP sentences (as defined by Willbanks) are categorically barred, a sentencer will lack the discretion to impose a sentence adequately tailored to *both* the nature and circumstances of the offense(s) and the history and character of the offender, as required by § 557.036.1 and *Miller*. Instead, the sentencer must elevate the *status* of the offender (age at time of offense and sentencing) above the nature and circumstances of the offense(s) committed and above the history and character of the offender, because, regardless of the offender's level of involvement, and regardless of the severity of the crime(s), if the offender was a juvenile at the time of the offense(s), he or she is categorically barred from receiving a term of imprisonment beyond his or her life expectancy. Practically speaking, this means that the more serious offender—the one who commits more crimes with higher felony classifications—is more likely to receive an "invalid" de facto LWOP sentence than the less serious and less culpable offender.

Though Willbanks does not directly state the remedy he is seeking,[16] if the mandatory minimums are unconstitutional, it would seem that the only remedy available would be to make him immediately parole eligible. Again, it would be difficult to justify the fact that a more serious and culpable offender gets the benefit of immediate parole eligibility while a less serious and less culpable offender does not.

For example: assume that two young women (both age 17) commit criminal offenses. The first young woman commits a single crime of the class C felony of second-degree arson, and she is sentenced to the maximum of seven years' imprisonment. Under 14 C.S.R. § 80-2.010, she must serve at least 33% (or 2.31 years) of her sentence before becoming parole eligible. The second young woman, however, commits a series of offenses, including kidnapping, first-degree

---

[16] He does, however, state that he is *not* seeking resentencing to concurrent terms.

assault, first-degree robbery, and armed criminal action and receives a sentence much like Willbanks's, rendering her ineligible for parole until her life expectancy has elapsed. If the remedy under Willbanks's argument is immediate parole eligibility, the second—and undeniably more culpable—young woman becomes parole eligible immediately upon her commitment to DOC; whereas the first young woman must spend a minimum of 2.31 years incarcerated before even being considered for parole. This results in yet another unjustifiable disparity.

Were we to accept Willbanks's argument, we would be injecting a level of arbitrariness into the sentencing of juvenile offenders, given that the offender's sentence (or associated parole eligibility date) might hinge on factors such as the offender's gender, race, ethnicity, socioeconomic status, or age at sentencing, just to name a few. None of those are relevant to the proper exercise of discretion at sentencing.

> In determining whether a punishment comports with human dignity, . . . the State must not arbitrarily inflict a severe punishment. This principle derives from the notion that the State does not respect human dignity when, without reason, it inflicts upon some people a severe punishment that it does not inflict upon others. Indeed, the very words 'cruel and unusual punishments' imply condemnation of the arbitrary infliction of severe punishments. And, as we now know, the English history of the Clause reveals a particular concern with the establishment of a safeguard against arbitrary punishments.

*Furman v. Georgia*, 408 U.S. 238, 274 (1972) (Brennan, J., concurring).

The crux of Willbanks's plea for expansion of *Graham* is the Court's mandate that, though "[a] State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime[, w]hat [it] must do . . . is give defendants like Graham some *meaningful opportunity to obtain release* based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 75 (emphasis added).

Though we recognize that a parole eligibility date set beyond an offender's life expectancy likely fails to provide a meaningful opportunity for release, *Graham*'s mandate was limited to the context of a single LWOP sentence imposed for a single conviction:

> The Constitution prohibits the imposition of ***a life without parole sentence*** on a juvenile offender who did not commit homicide. A State need not guarantee the offender eventual release, but ***if it imposes a sentence of life*** it must provide him or her with some realistic opportunity to obtain release before the end of that term.

*Graham*, 560 U.S. at 82 (emphasis added). It did not create a separate categorical bar for all terms of imprisonment extending a juvenile offender's parole eligibility date beyond his or her life expectancy. *See Bunch v. Smith*, 685 F.3d 546, 551 (6th Cir. 2012) (recognizing that the juvenile offender's 89-year sentence "may end up being the functional equivalent of life without parole," but rejecting the offender's claim that this violated *Graham*'s mandate for a "meaningful opportunity to obtain release" because *Graham*'s mandate applied only "if a state imposes a sentence of 'life.'"), *cert. denied*, *sub nom. Bunch v. Bobby*, 133 S.Ct 1996 (April 22, 2013). And, for all the inherent difficulties and potential sentencing disparities described above (as well as others not discussed),[17] we believe the Court's limitation was intentional. If this belief is incorrect, we are certain the High Court will let us know. Accordingly, we decline to extend *Graham*'s holding to multiple, consecutively imposed, non-LWOP, term-of-years sentences.

Willbanks's claim is denied.

## Conclusion

Willbanks's aggregate term of imprisonment of life plus 355 years, for which he will not be parole eligible until he is approximately 85 years old, does not violate the Supreme Court's

---

[17] For example, it is unclear whether a juvenile offender who receives a constitutionally permissible sentence, but is subsequently sentenced for an unrelated crime, is forever precluded from receiving a consecutively imposed sentence that would effectively guarantee that he would not be released within his lifetime.

holding in *Graham*.  Therefore, his appeal is dismissed, and his petition for writ of habeas corpus is denied.

_____
Karen King Mitchell, Presiding Judge

Lisa White Hardwick and Anthony Rex Gabbert, Judges, concur.